CAPITAL IMPROVEMENT BOARD OF MANAGERS OF MARION COUNTY, INDIANA, (CONVENTION CENTER), INDIANAPOLIS-MARION COUNTY BUILDING AUTHORITY, KLEIN & KUHN REALTORS, ELI LILLY AND COMPANY, SCOTT PAPER COMPANY, BY ITS DIVISION BEVERIDGE PAPER COMPANY, STEWART-WARNER CORPORATION, SOUTH WIND DIVISION, AND METHODIST HOSPITAL OF INDIANA, INC. *v.* PUBLIC SERVICE COMMISSION OF INDIANA, LARRY J. WALLACE, WILLIAM B. POWERS, AND JAMES M. PLASKETT, AS MEMBERS OF THE PUBLIC SERVICE COMMISSION OF INDIANA, FRANK BIDDINGER, PUBLIC COUNSELOR OF THE STATE OF INDIANA, INDIANAPOLIS POWER & LIGHT COMPANY

[No. 2-676A232. Filed April 25, 1978.]

Ted B. Lewis, Richard L. Gilliom, Richard E. Aikman, Jr., Stewart, Irwin, Gilliom, Fuller & Meyer, of Indianapolis, for appellants.

Marcus E. Woods, Jerry P. Belknap, Jon D. Noland, Barnes, Hickam, Pantzer & Boyd, of Indianapolis, for appellees.

LYBROOK, P.J. — The Indianapolis Power & Light Company (IPALCO) filed a petition with the Public Service Commission of Indiana (Commission) on June 27, 1975, for an increase in its existing steam service rate. IPALCO is a public utility engaged in the business of furnishing electric and steam services to the public and provides steam service to approximately 800 customers in the Indianapolis area, most of which are classified as industrial customers.

On August 21, 1975, the prehearing conference was held before a Deputy Commissioner in order to settle certain details of administrative procedure. IPALCO was ordered to file its prepared testimony and exhibits on or before September 4, 1975, and the Public Counselor and any authorized intervenors were ordered to file their prepared testimony and exhibits by November 17, 1975.

A petition to intervene was filed on October 10, 1975, by the following parties, all of whom were industrial and commercial users of steam: the Improvement Board of Managers of Marion County, Indiana (Convention Center); Indianapolis-Marion County Building Authority; Klein & Kuhn Realtors; Eli Lilly & Company; Scott Paper Company, by its Division, Beveridge Paper Company; and Stewart Warner Corporation, South Wind Division (Intervenors).[1] In substance, this petition alleged that the increase required by IPALCO was unjust and unreasonable. It was further alleged that the steam service purchased by these Intervenors represented over one half of the steam service rendered by IPALCO. This petition to intervene was granted by the Commission.

Public hearings were held on December 1, 2, and 3, 1975, at which time IPALCO presented its evidence in support of the rate increase.

---

1. Methodist Hospital of Indiana, Inc. was allowed to intervene at a later date.

The hearings were then continued until January 5 and 6, 1976, at which time Intervenors presented their evidence. The Commission then handed down its findings and final order on April 21, 1976, at which time it granted a rate increase to IPALCO.

The Commission in its findings recited that IPALCO was requesting a rate increase which would allow an operating income available for return of $2,236,605, and that Intervenors proposed a return of $1,858,572. The Commission then concluded that a fair income available for return would be $2,169,256. On the basis of the test year results, the Commission found that under existing rates, IPALCO's operating income available for return was $654,386, which return was totally inadequate. It therefore approved a rate increase for IPALCO and ordered IPALCO to file new rate schedules in accordance with its findings.

After a denial of their petition for rehearing by the Commission, Intervenors filed a timely Assignment of Errors[2] pursuant to IC 1971, 8-1-3-1 (Burns Code Ed.) and IC 1971, 8-1-3-2 (Burns Code Ed.).[3] Intervenors have raised sixteen issues for our review which they have consolidated in their brief into eight arguments. The eight arguments to be discussed in this opinion can be summarized as follows:

1. Did the Deputy Commissioner improperly deny Intervenors' preliminary motions?

2. Did the Deputy Commissioner improperly admit hearsay evidence as to IPALCO's separation study?

3. Does the Fuel Adjustment Clause in IPALCO's rate structure represent an unlawful delegation by the Commission of its rate-making authority?

4. Did the Commission commit error by admitting evidence from prior hearings and by violating its own prehearing order?

---

2. See *Scott Paper Company v. Public Service Commission* (1975), 164 Ind. App. 565, 330 N.E.2d 137, in which a similar appeal was dismissed for a failure to file a timely assignment of errors.

3. The provisions of IC 1971, 8-1-3-1 (Burns Code Ed.) *et seq.* have superseded the provisions in IC 1971, 8-1-2-6 (Burns Code Ed.) relating to appeal *de novo* of a Commission ruling to the Marion County Superior or Circuit Court. *See Indianapolis Power & Light Co. v. Highland Realty, Inc.* (1970), 253 Ind. 637, 256 N.E.2d 394.

5. Is the finding of the Commission as to the fair value of IPALCO's steam property contrary to law?

6. Did the Commission err by refusing certain accounting adjustments advanced by Intervenors?

7. Is the finding of the Commission as to the fair rate of return allowed to IPALCO contrary to law?

8. Is the decision of the Commission to allow a roll-in of prior fuel adjustment charges to base rate contrary to law?

## STANDARD OF REVIEW

The standard of review which is to be used in an appeal from a rate-making order of the Commission has been stated many times by this court. *See L.S. Ayres & Company v. Indianapolis Power & Light Company* (1976), 169 Ind. App. 653, 351 N.E.2d 814. We are not free to weigh and analyze the evidence presented, formulate our own opinion as to the proper conclusions, and then revise the Commission's order accordingly. *Public Service Commission v. Indiana Telephone Corporation* (1957), 237 Ind. 352, 146 N.E.2d 248. Rather, we must measure the Commission's order by use of the substantial evidence test:

> "We start with the general principle that so long as there is any substantial evidence to support the rates as fixed by the Commission as reasonable, the judicial branch of the government will not interfere with such legislative functions. We have no power or authority to substitute our personal judgment for what we might think is fair or reasonable in lieu of the administrative judgment of the Public Service Commission." (Citations omitted). *Boone County REMC v. Public Service Commission* (1959), 239 Ind. 525, 532, 159 N.E.2d 121, 124.

The purpose of this test is to leave the function of fact-finding and rate-making with the Commission, which should have the necessary experties and experience that is needed to accomplish the task, rather than leaving that function with an appellate court. *Public Service Commission v. City of Indianapolis* (1956), 235 Ind. 70, 131 N.E.2d 308.

The second step in our judicial review involves the determination of whether the order of the Commission is contrary to law. This court

must review the proceedings below and the findings of the Commission to be sure that the resulting order was not the product of the consideration or the failure to consider some factor or element which improperly influenced the final determination. We must also be sure that the Commission remains within its jurisdiction and that it conforms to all relevant statutes, standards and legal principles. *Public Service Commission v. City of Indianapolis, supra.*

## ARGUMENT I

### PRELIMINARY MOTIONS

The public hearing in this matter was originally scheduled for October 20, 1975, but was continued on the Intervenors' motion until December 1, 1975, to give Intervenors additional time to prepare for the hearing. At the beginning of the hearing, the Deputy Commissioner who was to conduct the proceedings requested the filing of any preliminary motions. Intervenors had come to the hearing armed with the following battery of previously prepared motions which they filed with the Deputy Commissioner seriatim:

1. Motion for continuance.

2. Motion to appeal the denial of the motion for continuance to the full Commission, *en banc*, with oral argument.

3. Motion for appellate review by the full Commission, *en banc*, with oral argument, on all rulings of the Deputy Commissioner.

4. Motion to vacate the Deputy Commissioner's ruling on motion for continuance and appeal thereon.

5. Motion to vacate Deputy Commissioner's ruling on motion for appellate review by the full Commission.

6. Motion in limine to prevent admission of certain testimony.

7. Motion for immediate appeal of denial of motion in limine by the full Commission, *en banc*, with oral argument.

8. Motion to suspend the proceedings and request for transcript of proceedings in order to allow the filing of petition for a Writ of Mandate in the Indiana Supreme Court.

The Deputy Commissioner denied each of the motions directed to him. As to the motions for appellate review, the Deputy Commissioner

left the hearing room after each motion and personally presented each motion to the full Commission. The Commission denied each such motion without argument. The Intervenors argue that Rule XVII (f) of the Public Service Commission allows, as a matter of right, an immediate and full appeal, with oral argument, of any ruling of the Deputy Commissioner. Rule XVII(f) reads as follows:

> "Any ruling of the Presiding Commissioner, Deputy Commissioner or Examiner may be appealed to the Commission for ruling. The ruling of the Commission, when made, shall be noted in the stenographic record and, if made after the hearing is closed, the Commission will advise all parties of record of such ruling. Pending such ruling of the Commisson on appeal, the proceeding may proceed on the basis of the ruling of the Presiding Commissioner, Deputy Commissioner or Examiner subject to the preservation of any rights of any party on the results of the appeal to the full Commission."

The argument is advanced by Intervenors that reversible error was committed by the Deputy Commissioner and the full Commission by their failure to grant immediate appellate review under Rule XVII(f) (as it is interpreted by the Intervenors). It is also contained that the denial of oral argument constituted a denial of due process of law. Finally, it is argued that the decision making process of the Commission was unlawful in that the full Commission, in making its decision, did not review the entire record, and also that the decision making process was so biased that is clearly evidenced inherent impropriety.

Although Intervenors have advanced a multitude of procedural arguments in support of this issue, conspicuous by its absence is the failure of Intervenors to even tangentially argue the merits of any of the above preliminary motions. We feel that this failure to assert or argue the merits on any of the motions is directly linked to the fact that each of these motions is devoid of merit and such motions were therefore properly overruled. We believe that there is substantial evidence in the record to support the Deputy Commissioner's decision to overrule each of Intervenors' motions, and therefore those rulings may not be overturned.

Intervenors have cited no authority which would persuade us to hold that they are entitled, as a matter of law, to an interlocutory appeal

to the full Commission with oral argument from every ruling of a Public Service Commission hearing officer. To the contrary, the rule cited by Intervenors expressly provides that the hearing may proceed upon the hearing officer's decision pending the decision of the Full Commission. In its final order, the Commission stated that it considered each of Intervenors' motions and affirmed the decision of the Deputy Commissioner. Therefore, Intervenors were in fact allowed an appeal on each of ther motions.

In their reply brief, Intervenors imply that the alleged improprieties in the hearing on their preliminary motions may have ascended to the gravity of a violation of Canon 9 of the Code of Professional Responsibility. Because this is not the proper forum in which to consider possible transgressions of legal ethics, we need not consider such implications.

## ARGUMENT II

## THE SEPARATION STUDY

The next allegation of error concerns the testimony of Robert Leemans as witness for IPALCO. It is first urged by Intervenors that Leemans' prefiled testimony, denominated as Petitioner's Exhibit C and Petitioner's Exhibit 4, constituted inadmissible hearsay and that the admission of this evidence was therefore contrary to law.

We must first point out that the rule prohibiting the admission of hearsay evidence has been relaxed to a certain extent in proceedings before administrative agencies and boards. *Indianapolis & Southern Motor Express v. Public Service Commission* (1953), 232 Ind. 377, 112 N.E.2d 864. As a general rule, the mere admission of hearsay evidence alone will not be a sufficient ground for the reversal of an action or finding by an administrative agency or board. *Robinson v. Twigg Industries, Inc.* (1972), 154 Ind. App. 339, 289 N.E.2d 733; *United Paperboard Co. v. Lewis* (1917), 65 Ind. App. 356, 117 N.E. 276. However, the administrative action cannot be based merely on hearsay evidence, but must be corroborated by other competent evidence. *Robinson v. Twigg Industries, Inc., supra. But cf. C.T.S. Corporation v. Schoulton* (1976), Ind. App. 354 N.E.2d 324.

While the admission of IPALCO's exhibits concerning the separa-

tion study is not of itself sufficient cause for a remand to the Commission, it appears that the objections to these exhibits go to the very heart of IPALCO's allocation methods and to the computation of any rate increase. We will therefore proceed with a consideration of the merits of Intervenors' hearsay objections.

Leemans is a consulting engineer employed by Ebasco Services Incorporated (Ebasco) which is an independent engineering and consulting firm. He holds a degree in mechanical engineering and has over 35 years of experience in the field of engineering. In January of 1953, Ebasco was employed by IPALCO to perform a survey on allocation methods applicable to the expenses and properties of IPALCO to allow a separation of charges for steam and electric service. Because common facilities are used by IPALCO in generating both steam and electricity to be sold to its customers, it is necessary for IPALCO to establish proper allocation methods for such factors as utility property, working capital, operating expenses, taxes, and annual depreciation charges. The purpose of the original survey, according to Leemans, was not to develop a dollar and cents allocation but rather to develop proper methods which would be sufficient to allow both present and future computations of proper allocation. In other words, it was contemplated that continuing use would be made of the survey and its recommended methods, subject to periodic updating, until such time as some fundamental change in steam and electric generation was made.

Although Leemans was employed by Ebasco at the time the survey was made, he had no part in producing the original report. In 1972, Leemans was assigned to Indianapolis to participate in updating the original survey which had been completed in 1954. From that date until the time of the hearing, Leemans prepared numerous updating reports on the IPALCO property. In preparing these reports, it was necessary for Leemans to study the original survey and personally observe the operations at IPALCO's facilities. As a result of his studies and observations, he became satisfied with the 1954 report and used that report in developing updated allocation reports.

Petitioner's Exhibit C was the prefiled testimony of Leemans consisting of questions and answers on direct examination. It was in this exhibit that Leemans summarized his qualifications, the background

of the Ebasco report, his work in reviewing and updating the report, and the methods and conclusions as to the proper allocation of IPALCO property. Petitioner's Exhibit 4 is the entire report prepared by Leemans for IPALCO complete with professional analysis, diagrams, charts and mathematical computations.

This lengthy recitation of background material is necessary in order to understand the nature of the Intervenors' objections. It is the basis of their objections that Leemans admittedly had not participated in or supervised the original Ebasco report but yet used that report in formulating his testimony in Exhibit C and in compiling the report filed as Exhibit No. 4. It is therefore argued that his prefiled testimony concerning allocation methods was not based on first hand knowledge but rather the opinions, conclusions, and inferences of other persons which rendered such testimony inadmissible as hearsay.

Intervenors first cite the case of *Warren v. Waterville Urban Renewal Authority* (Maine 1967), 235 A.2d 295, *cert. denied,* 390 U.S. 1006, in response to Leemans' statement that he adopted the findings and results of the original Ebasco report. In *Warren,* which was a condemnation case, the court stated that it was improper for an expert to express the opinion of another by adoption, and that an expert witness cannot act as a mere conduit for the opinion of a person who is not a witness. Intervenors also cite a number of cases found in an annotation at 19 A.L.R.3d 1008 as supporting the principle that an expert cannot testify as to tests or surveys performed by a third person.

All of the cases cited by Intervenors involved factual situations significantly different from the case at bar in that the alleged experts in the cited cases were not giving their own expert opinions. In the case of *Mehochko v. Gold Seal Co.* (1966), 66 Ill. App.2d 54, 213 N.E.2d 581, for example, which was a products liability case, the court refused to allow an expert to testify as to an independent study performed on the allegedly defective product. The expert in that case, however, knew nothing about the product or the test. In effect, he was merely reading the results of another person's tests to the jury and was not rendering his own expert opinion. Likewise, in *Robertson v. Coca Cola Bottling Company* (1952), 195 Ore. 668, 247 P.2d 217, the trial court refused to allow an expert witness to describe a report on glass bottles

reported in an independent college study when it was brought out that the expert had performed no studies of his own and had done nothing to verify the accuracy of the study to be admitted.

We believe that the above cases and other cases cited by Intervenors are inapposite to the case before us. Although Leemans did not participate in or supervise the original Ebasco report, he was not a "stranger to the evidence." The record clearly shows that Leemans had sufficient professional credentials to be considered an expert, that it was necessary for him to review the original report and form a professional opinion as to its accuracy and applicability, and that he had been assigned to the IPALCO facilities for over three years for the purpose of updating and revising the report.[4]

From this there is substantial evidence to conclude that Leemans

---

4. The following excerpt from Leemans' prefiled testimony is illustrative of his familiarity with the IPALCO facilities:

"20.  What have you done to familiarize yourself with the layout and operating conditions at the Perry K and Perry W. Stations?

(a)  Shortly after I was first assigned to the study in February 1972, I visited Indianapolis in the company of Mr. M. Hatton of Ebasco's Rate Department who had worked on several of the earlier reports and was familiar with the system. We visited both stations and examined the equipment. We consulted with Petitioner's engineers concerning the methods of operations and reviewed operating records.

Subsequently, in the spring of 1973, I revisited both stations, during preparation of my February and June 1973 reports, and an October 1973 report dealing with cost allocations between the industrial and general steam services rendered by Petitioner. I was at both stations in January 1974 in connection with the preparation of our February 1974 report, and in January 1975, I again visited both stations in preparing the current report.

21.  Have you also familiarized yourself with the Steam Heat Distribution System?

(a)  Yes. I studied drawings showing the layout of the steam mains, the location of the pressure reducing valves and the location of the Industrial Customers. I also reviewed records of the amounts of steam taken by the Industrial Customers, and Petitioner's property records showing the original cost of the Steam Heat Distribution System by components.

22.  Did you recommend any changes in the engineering determinations and methods of allocation as a result of your most recent study?

(a)  Except for one change, I found Ebasco's prior engineering determinations and the allocation methods based on them to be applicable to Petitioner's operations during the test year established in this proceeding."

was giving his own expert opinion and not merely acting as a conduit for the opinions of others.

We believe that the appropriate rule of law is stated in another portion of the *Warren* case:

"The opinion of an expert is not necessarily rendered inadmissible or incompetent because it may be based on knowledge of facts gained from hearsay sources. Any expert worthy of the name must of necessity assimilate prior learning derived from the experiences of others. As an expert witness he draws upon various sources of information whose credibility or trustworthiness he must determine in light of his expertness. It would completely frustrate the use of expert witnesses if they were obliged to substantiate each single factor upon which their ultimate opinion must depend upon first hand personal knowledge or personal experience. If some of the expert's factual information is derived from sources fairly trustworthy though hearsay and he has as such the ability to coordinate and evaluate that information with all the other facts in his possession secured through personal observation, the trial court may in the exercise of a sound discretion permit the expert's ultimate opinion to be considered by the jury."

235 A.2d at 300.

In support of this rule, the court quoted from the case of *Isenhour v. State* (1901), 157 Ind. 517, 62 N.E. 40, in which our Supreme Court held that an expert witness need not always limit his testimony to facts obtained from personal observation.

In *Gooch v. Hiatt* (1976), 166 Ind. App 521, 337 N.E.2d 585, this court affirmed the rule stated in *Trinity Universal Insurance Co. v. Town of Speedway* (1965), 137 Ind. App. 510, 210 N.E.2d 95, that the opinion of an expert witness that is based in part on hearsay customarily relied upon by such experts is properly admissible. In the *Trinity* case, the town engineer was allowed to give his expert opinion as to the costs of repairs on certain streets. The court rejected the argument that because the engineer had used information from different paving contractors and because officials of those companies were not called to testify, his testimony was based on hearsay and therefore was inadmissible. The *Trinity* case is one of many cases cited in McCormick on Evidence, 2d Ed., § 15 (1972), in support of the author's argument that such testimony is properly admissible:

"It is reasonable to assume that an expert in a science is competent to judge the reliability of statements made to him by other investigators or technicians . . . If the statements, then, are attested by the expert as the basis for a judgment upon which he would act in the practice of his profession, it seems that they should ordinarily be a sufficient basis even standing alone for his direct expression of professional opinion on the stand, and this argument is reinforced when the opinion is founded not only upon reports but also in part upon the expert's first-hand observation. . . ." (Footnotes omitted). McCormick, *supra*, at pages 35-36.

There is substantial evidence in the record to indicate that Leemans was not offering the original Ebasco report as evidence but rather had used that study in compiling his own report. The record further shows that the report filed as Exhibit No. 4 was prepared either by Leemans or under his direct supervision and that the conclusions as to the proper allocation methods contained in Exhibit C were his own. Leemans was present at the hearing to sponsor the exhibits and he was available for cross-examination. Intervenors have not argued that their cross-examination was inhibited in any manner and the record shows that Leemans was in fact extensively cross-examined. We can find no error in admitting his testimony.

Intervenors also argue that error was committed when the Deputy Commissioner recalled Leemans to the witness stand. They argue that such action is in violation of IC 1971, 8-1-1-5 (Burns Code Ed.),[5] which provides that the Commission shall not offer any evidence in a hearing nor act as a proponent or opponent on any issue. Intervenors did not

---

5. "The commission created by this act [8-1-1-1 — 8-1-1-13] shall in all controversial proceedings heard by it be an impartial factfinding body and shall make its orders in such cases upon the facts impartially found by it. The commission shall in no such proceeding, during the hearing, act in the role either of a proponent or opponent on any issue to be decided by it. All evidence given in any proceeding shall be offered on behalf of the respective parties to, or appearing in, the proceeding and not in the name or behalf of the commission itself. If in any such proceeding the public interest is not otherwise adequately represented by counsel, in the opinion of the commission, it shall be the duty of the public counselor, if requested by the commission, to make adequate preparation for the presentation of the interests of the public in such proceeding and he shall at the hearing represent the public interests therein involved: Provided, however, That nothing in this section contained shall prevent the public service commission of Indiana from instituting, prosecuting, hearing or determining any investigation or proceeding which it is authorized to do, or make, on its own motion by any law with the administration of which it is charged."

object at the time Leemans was recalled but later objected to the questions and made a motion to strike Leemans' testimony.

We have examined the questions which were propounded by the examiner and can find nothing which would imply that the Deputy Commissioner was in any manner offering evidence or acting as a proponent for IPALCO. The witness earlier had been presented by IPALCO and his substantive testimony was elicited by its counsel. Intervenors then objected to his testimony arguing, in essence, that Leemans was "a stranger to the evidence" and that he was acting as "a conduit" for the opinions of others. The Deputy Commissioner later called Leemans back to the stand to clarify the extent of Leemans' personal knowledge of the IPALCO facilities. The Deputy Commissioner was merely asking clarifying questions, which is well within the discretion of a hearing judge. Such discretion is even allowed to a certain extent to a trial judge in a criminal prosecution. *Dombkowski v. State* (1967), 249 Ind. 32, 230 N.E.2d 602. Under the circumstances, we do not see how the Deputy Commissioner could properly have ruled upon the Intervenors' objections without ascertaining, to his own satisfaction, the qualifications of Leemans to testify. He was neither soliciting substantive testimony nor offering evidence on behalf of the Commission. In fact, he specifically stated that he did not intend to substantiate or verify Leemans' testimony, but only verify the basis of his opinions:

> "Deputy Commissioner Somes: Yes, you may. My questions are designed primarily to inquire not as to either the correctness or incorrectness of Mr. Leemans' testimony or the accuracy, necessarily, of Exhibit No. 4 which is sponsored by Mr. Leemans, but to inquire about his familiarity with some of the raw data upon which Exhibit No. 4 is based — not necessarily advocating one position or the other, but simply to inquire as to how much knowledge Mr. Leemans has and upon which he bases his opinions."

The statute involved here was not designed to prohibit the Commission or one of its hearing officers from asking clarifying questions, but rather was designed to place the Commission in the role of a disinterested fact finder rather than that of an advocate. The record does not support the conclusion that the Deputy Commissioner deviated from that role.

## ARGUMENT III

## FUEL ADJUSTMENT CHARGE

Intervenors next argue that their motion to sever the fuel adjustment clause from the hearing was improperly denied. They assert that the approval of an automatic fuel adjustment clause amounts to an improper delegation of rate-making authority from the Commission to a utility and also that the Commission approved the fuel adjustment clause without a proper hearing.

Intervenors interpret IC 1971, 8-1-2-42 (Burns Supp. 1977),[6] as prohibiting such fuel adjustment clauses by requiring Public Service Commission approval of all rate increases. However, subsection (b) of that statute specifically contemplate the use of such a device.[7] Furthermore, the recent case of *City of Evansville v. Southern Indiana Gas & Electric Company* (1975), 167 Ind. App. 472,

---

6. The relevant portion of that statute reads as follows:

[8-1-2-42] "(a) No change shall thereafter be made in any schedule, including schedules of joint rates, except upon thirty [30] days' notice to the commission and approval by the commission and all such changes shall be plainly indicated upon existing schedules or by filing new schedules in lieu thereof thirty [30] days prior to the time the same are to take effect. The commission, upon application of any public utility, may prescribe a less time within which a reduction may be made.

(b) No schedule of rates, tolls and charges of a public, municipally-owned or cooperatively-owned utility which includes or authorizes any changes in charges based upon costs is effective without the approval of the commission. Before the commission approves any changes in the schedule of rates, tolls and charges of an electric utility, which generates and sells electricity, based upon the cost of fuel to generate electricity or upon the cost of fuel included in the cost of purchased electricity, the public counselor shall examine the books and records of the public, municipally-owned or cooperatively-owned generating utility to determine the cost of fuel upon which the proposed changes are based. In addition, before such a fuel cost rate change becomes effective, the commission shall hold a summary hearing on the sole issue of the fuel adjustment charge. The public counselor shall conduct his review and make a report to the commission within twenty (20) days after the utility's request for the fuel cost adjustment is filed. The commission shall hold the summary hearing and issue its order within twenty [20] days after it receives the public counselor's report. The provisions of IC 1971, 8-1-2-39; IC 1971, 8-1-2-42 [this section]; IC 1971, 8-1-2-43; IC 1971, 8-1-2-54; IC 1971, 8-1-2-55; IC 1971, 8-1-2-56; IC 1971, 8-1-2-59; IC 1971, 8-1-2-60; and IC 1971, 8-1-2-61 concerning the filing, printing and changing of rate schedules and the time required for giving notice of hearing and requiring publication of notice does [sic] not apply to such a fuel adjustment clause or such a summary hearing."

7. Subsection (b) became effective April 30, 1975.

339 N.E.2d 562, considered in depth this same argument and concluded that the fuel adjustment clauses are not *per se* unlawful.

While the court in *Southern Indiana* held that such clauses are not *per se* unlawful, it did require that the Commission scrutinize and approve any rate change according to the procedure outlined in IC 1971, 8-1-2-42 (Burns Supp. 1977). Intervenors urge that the Commission failed in its duty to scrutinize the fuel adjustment clause in this case and quote testimony from the transcript to suggest that no hearing was held and no information was filed concerning the fuel adjustment clause. However, Intervenors overlook the findings of fact and final order of the Commission in which the Commission ordered IPALCO to file new schedules and supporting materials with the Tariff Division for review and approval before effecting any rate revisions under such a clause. In light of the above, we need not consider IPALCO's argument that the procedure in IC 1971, 8-1-2-42 (Burns Supp. 1977) does not apply because the rate increases in this case involve the generation of steam rather than electricity.

## ARGUMENT IV

## IMPROPER EVIDENCE

The Intervenors have chosen to combine three issues in their next argument. It is first asserted that the Commission erred by relying upon an order in a prior case in support of the allocation methods contained in the Ebasco report, and secondly, that the Commission erred in not adopting the Intervenors' evidence on proper allocation methods. Finally, it is argued that the Commission violated its own prehearing order by allowing IPALCO to divide the test year.

The record shows that in the prefiled testimony of IPALCO's witness, Zane Todd, there was a statement relating the fact that the Ebasco study had been approved in several prior rate cases. As Intervenors made no objection to the admission of that statement, they cannot now claim as error on appeal the admission of that evidence. There is also a statement in Finding Number 5 of the Commission's final order which recites that the Ebasco study was approved in one of the prior cases mentioned in Todd's testimony. Intervenors assert that it was error for the Commission to rely on the findings of the prior rate case to which they were not parties.

Intervenors argue that they cannot be bound by a decision in a prior case and that, in any event, it is improper for the Commission to rely on prior decisions because this relieves IPALCO of its burden of proving the necessity for a rate increase. Further, the decision relied upon was delivered in an electric rate-making case rather than a steam rate case. Finally they contend that because the Ebasco study was inadmissible on the above grounds, there was no probative evidence to support the allocation methods adopted by the Commission, and it therefore erred by not adopting the allocation methods advanced by Intervenors.

The question as to whether or not it was error for the Commission to rely on an earlier decision in making its findings in this case is a question we need not decide. The Commission did not merely rely on its prior decision in making its finding, but went on to recite detailed findings of fact to support its decision on allocation methods, which findings are supported in full by the Ebasco study and the testimony of IPALCO's witness, Leemans. As we have already determined that the Ebasco study was properly admitted and constituted competent evidence on allocation methods, we can only conclude that the Commission's Finding Number 5, which adopts the evidence on allocation methods presented by IPALCO, was supported by substantial evidence and is not contrary to law. It then follows that Intervenors' contention that the Commission erred in not adopting their evidence on allocation methods becomes merely an invitation for us to weigh the evidence in this case and from our own conclusions which is an invitation we must decline.

Intervenors also argue that the Commission violated its own prehearing order by allowing IPALCO's expert to divide the test year into two six-month segments. The portion of the prehearing order establishing that period reads as follows:

"1. The 'test year' to be used in determining accounting, financial and engineering evidence shall be the twelve (12) months ending April 30, 1975."

We can find nothing in the order that would prohibit the division of the test year for purposes of analysis. The use of a historical test period is the generally accepted method for setting rates for the future by taking the actual results for the particular test year and adjusting for any extraordinary and nonrecurring

items and for all known and measurable changes. *In re Vermont Gas Systems, Inc.* (1973), 100 P.U.R.3d 202. The test year sets the limits by which the factors of rate-making can be known and used for the rate-making process. As a general rule, it does not take into consideration future expenses or future revenues except known changes in both expenses and revenues occurring within a reasonable proximity of the test year. *In re Southern Connecticut Gas Co.* (1974), 7 P.U.R.4th 364. The object of the test year is merely to reflect typical operating conditions of a utility and provide a reliable guide in fixing rates for the future by monitoring actual operating results over a representative period of time. We do not see how a division of this period could possibly prejudice the Intervenors or distort the accuracy of this device. Furthermore, as pointed out by IPALCO, the expert witness for Intervenors divided the test year into twelve monthly periods in making his allocation recommendations. Obviously, the Commission did not construe the prehearing order in the manner now suggested by Intervenors. As the Commission's interpretation of its order establishing a test year is reasonable and is consonant with the evidence in this case, and because Intervenors have not demonstrated any prejudice or harm from the Commission's interpretation, that interpretation must be sustained.

## ARGUMENT V

### FAIR VALUE DETERMINATION

Intervenors take issue with the Commission's Finding Number 6 in which the fair value of IPALCO's steam property was found to be $31,438,488. They contend that this finding is contrary to law in that the Commission failed to elucidate in its findings the basic facts upon which its ultimate conclusion must rest. Intervenors further contend that there is insufficient evidence in the record to support the fair value figure computed by the Commission.

It is elemental law that an administrative agency such as the Public Service Commission that is subject to judicial review is required to state in its findings and final order "specific findings on all the factual determinations material to its ultimate conclusion." *L.S. Ayres, supra; Southern Indiana Gas, supra.* There are several practical reasons for requiring such a recitation: (1) facilitation

of judicial review; (2) avoidance of judicial usurpation of administrative functions; (3) assisting parties in planning cases for administrative functions; (4) assisting parties in planning cases for administrative rehearing and judicial review; and (5) keeping agencies within their jurisdiction and within the law. 2 Davis, Administrative Law Treatise (1958), § 16.05, p. 444. An appellate court in reviewing the decision of an administrative body is not to substitute its own opinions and conclusions for those of the agency, but rather must give deference to the expertise of that agency. Therefore, the court's duty on appeal is to review the administrative proceedings to see that the agency's decision is supported by substantial evidence, that it was not arbitrary or capricious, and that the agency complied with all relevant rules of law and procedure, including the agency's own rules. It follows from this that a court cannot properly fulfill its duty of review if it is presented with a defective or incomplete statement of the basic findings upon which the agency's ultimate decision rests.

The proper procedure which an agency should follow in reaching its ultimate decision was stated in the case of *Saginaw Broadcasting Company v. FCC* (1938), 96 F.2d 554, *cert. denied,* 305 U.S. 613:

"The process necessarily includes at least four parts: (1) evidence must be taken and weighed, both as to its accuracy and credibility; (2) from attentive consideration of this evidence a determination of facts of a basic or underlying nature must be reached; (3) from these basic facts the ultimate facts, usually in the language of the statute, are to be inferred, or not, as the case may be; (4) from this finding the decision will follow by the application of the statutory criterion." 96 F.2d at 559.

The requirement that an agency must formulate the basic findings or basic facts and then incorporate those facts in its ultimate findings often gives rise to the problem of deciding the specificity with which those facts must be expressed and also of differentiating between basic findings and ultimate conclusions.

Professor Davis in his treatise on administrative law has expressed the following cogent distinction:

"The basic findings are those on which the ultimate finding rests;

the basic findings are more detailed than the ultimate finding but less detailed than a summary of the evidence." 2 Davis, *supra*, § 16.06, p. 451.

As to the requirement of specificity of findings, no precise guidelines can be drawn. The rule that has been followed in this State is succinctly stated in *Fred J. Stewart Trucking, Inc. v. Bunn Trucking Company* (1972), 151 Ind. App. 157, 278 N.E.2d 310: "The findings must be specific enough to enable the court to review intelligently the commission's decisions."

When the facts and findings of the agency are stated with sufficient particularity and specificity that this court feels it can adequately and competently review and comprehend the decision of the agency, the requirement of reciting specific facts is satisfied.

By the terms of IC 1971, 8-1-2-6 (Burns Code Ed.), the Commission is to value the property of a utility both used and useful in serving the public and is to use its own expertise and discretion in considering the methods of valuation and extent to which it will take those methods into consideration in making its final decision.

As discussed in Judge Staton's opinion in the *L.S. Ayres* case, there are two generally accepted methods used in determining the value of utility property: (1) original cost method and (2) fair value or reproduction cost new minus depreciation method. While the Commission is required to admit and consider evidence of value under both methods, it is not necessarily required to accept the valuation computed under either method. Instead, the Commission is to balance such evidence along with other factors to achieve a figure that is fair and equitable to both investor and consumer. *Public Service Commission v. City of Indianapolis* (1956), 235 Ind. 70, 131 N.E.2d 308; *Public Service Commission v. Indianapolis Railways* (1948), 225 Ind. 656, 76 N.E.2d 841.

In its Finding Number 6, the Commission first recites the basic facts supporting its conclusion that all of the IPALCO facilities considered were indeed used and useful for the convenience of the public, which conclusion is not challenged by Intervenors. It then recites its basic findings of fact as to original cost of plant less depreciation ($24,328,555), current cost or reproduction cost new minus depreciation ($32,645,531),

depreciation reserve ($8,725,250), the cost of bringing plant and equipment to its present efficiency ($1,000,000), value of materials and supplies on hand ($1,225,673), and the cost of fuel inventory adjustment ($276,434). Each of the above figures is supported by competent evidence contained in the record. From these basic findings, the Commission made its ultimate finding of value of $31,438,488, which figure is well within the boundaries of the basic facts recited.

Intervenors attack the Commission's finding of value by presenting various computations involving the mathematics used by the Commission. The apparent purpose of these computations is to show that the basic figures cited by the Commission do not in fact support its final computation of value. In addition, Intervenors argue that because the testimony of IPALCO's witnesses as to the value of its property was not completely consistent and because the Commission relied on that evidence in making its findings, there is insufficient evidence in the record to support the Commission's decision.

We believe, however, that the findings of the Commission which are recited above are more than ample to support the Commission's ultimate finding of value. Intervenors have not demonstrated an absence of findings as to any of the elements which are required to be considered under IC 1971, 8-1-2-6 (Burns Code Ed.). While they claim that the findings contain insufficient factual details, it appears that a more explicit finding of fact could only be accomplished by a recitation of technical mathematical evidence. As stated above, the requirement of specific findings of fact requires a statement of those facts supporting the ultimate decision rather than a mere recitation or summary of evidence.

We further feel that it is the Intervenors' computations rather than the Commission's findings which are unsupported by the record evidence. While it is true that the testimony of IPALCO's witnesses as to the value of its property did not produce a uniform valuation figure, the variations pointed out by Intervenors reflect minor differences in expert opinion which are to be expected whenever various experts express their opinions as to the results of a complex computation. It is the responsibility of the Commission to weigh and consider such evidence in reaching its conclusion as to fair value. The testimony

given by IPALCO's witnesses was reasonably consistent and we cannot say that the Commission erred in adopting that evidence.

## ARGUMENT VI

## ACCOUNTING ADJUSTMENTS

In its Finding No. 7, the Commission set out its computation of IPALCO's operating income available for return that was earned by its steam utility operation. Intervenors argue that the Commission erred in refusing to adopt four adjustments to this computation which were advanced by Intervenors.

### A.

The first adjustment involves the allocation methods to be used in separating IPALCO's plant and equipment between steam and electricity generation. However, Intervenors merely reiterate their objections to the Ebasco report and to the testimony of IPALCO's witness Leemans. As we have already decided this issue adversely to Intervenors we need not discuss this issue again.

### B.

The next adjustment concerns a contract for the purchase of steam between IPALCO and IUPUI. This contract allows a much lower rate for steam service to IUPUI than for other steam customers. Intervenors argue that this rate is discriminatory and preferential and therefore the Commission's order refusing to adjust the contract rate to the same rate charged to other steam customers is contrary to law.

The Commission in its order acknowledged that IUPUI was indeed paying a different rate for its steam service. It justifies this rate differential by finding that peculiar factual circumstances "tend to make the service to IUPUI a class of service clearly identifiable from service to other steam customers." The first circumstances cited by the Commission is the contractual duty on the part of IUPUI to return at least 75% of the steam delivered to it in the form of condensate at a temperature not below 140° fahrenheit. A failure to return this condensate as required results in the assessment of a monetary penalty according to a formula set out in the contract. The record shows that no other steam customer returns any condensate. This means that the

steam requirements attributable to all other customers must be generated from cold city and river water heated by steam-driven auxiliaries at the plant, resulting in higher operating costs. The second circumstance cited in support of the Commission's finding is the fact that IUPUI receives its steam at the property line of one of IPALCO's generating plants. This means that no distribution system was constructed or is maintained in order to deliver steam to IUPUI and no resulting maintenance or construction costs are or were incurred in serving the university property.

Intervenors allege that the testimony of their expert witness Drees shows that no condenstate was in fact returned by IUPUI, and therefore the first justifying circumstance cited by the Commission is invalid. The record shows that Drees, a CPA with extensive professional credentials, testified that IUPUI never received a *credit* for condensate returned during the test year. On cross-examination, however, it was shown that Drees was unaware that under the contract IUPUI was not to receive any *credit* for condensate return but rather was to be assessed a *penalty* for failure to return the proper amount of condensate. This absence of any penalty for failure to return condensate therefore implies that the proper amount was indeed returned by IUPUI.

The next argument advanced by Intervenors is that the rate differential violates the provisions of IC 1971, 8-1-2-44 (Burns Code Ed.) and IC 1971, 8-1-2-68 (Burns Code Ed.) which read as follows:

"8-1-2-44. — It shall be unlawful for any public utility to charge, demand, collect or receive a greater or lesser compensation for any service performed by it within the State, or for any service in connection therewith, than is specified in such printed schedules, including schedules of joint rates, as may at the time be in force, or to demand, collect or receive any rates, tolls or charges not specified in such schedule. The rates, tolls and charges named therein shall be the lawful rates, tolls and charges unless the same are changed as provided in this act [8-1-2-1 — 8-1-2-120]."

\* \* \*

"8-1-2-68. — Whenever, upon an investigation, the commission shall find any rates, tolls, charges, schedules or joint rate or rates, to be unjust, unreasonable, insufficient or unjustly discriminatory,

or to be preferential or otherwise in violation of any other provisions of this act [8-1-2-1 — 8-1-2-120], the commission shall determine, and by order fix just and reasonable rates, tolls, charges, schedules or joint rates to be imposed, observed and followed in the future in lieu of those found to be unjust, unreasonable, insufficient or unjustly discriminatory or preferential or otherwise in violation of any other provisions of this act."

The first statute cited above plainly does not apply, for it prohibits a utility from charging a rate other than one which has been filed with and approved by the Public Service Commission. It is uncontroverted that the contract setting the rate between IPALCO and IUPUI was duly filed and approved by the Commission. Therefore, IUPUI was being charged at a properly scheduled rate and IC 1971, 8-1-2-44 (Burns Code Ed.) has not been violated.

The second statute cited by Intervenors, IC 1971, 8-1-2-68, (Burns Code Ed.) does not prohibit differing rates for differing classes or types of service, but rather proscribes unreasonable differences or unjust discrimination. It is only *unreasonable* differences in rates between customers or classes of customers that violate this statute. *L.S. Ayres & Co. v. Indianapolis Power & Light Company, supra.* The charging of different rates for service rendered under different conditions and under different circumstances is not unlawful or unduly preferential. *See Public Utility Commission v. Pennsylvania R. Co.* (1962), 42 P.U.R.3d 166. This court must give deference to the expertise of the Commission in making its determination of the reasonableness of the rate discrimination:

"In determining whether rates are unreasonably discriminatory the administrative agency must be granted an area of discretion. Absolute equality between classes of service is a practical impossibility. Rates for different classes of service need not be uniform or equal or equally profitable to the utility; the prohibition is against unreasonable or undue discrimination in the application of the rates." (Citations omitted). (Footnote omitted). *City of Pittsburgh v. Pennsylvania Public Utility Commission* (1951), 168 Pa. Super. 95, 78 A.2d 35, 38.

The record in this case shows that IUPUI is unique as a steam customer in that it returns a substantial portion of condensate which in turn reduces IPALCO's operating costs. Further, because the pro-

perty lines of IUPUI and one of IPALCO's generating plants are adjacent, IPALCO has not incurred the construction and maintenance expenses of a steam distribution system. From this, we conclude that there is sufficient evidence to support the Commission's finding that IUPUI is identifiably different from other steam customers and it is therefore properly the subject of a different steam rate.

However, as we have already determined, it is the duty of this court to examine the reasonableness of the findings of the Commission, and we cannot effectively perform that function without specific findings of basic facts in support of the Commission's ultimate findings. In refusing to adjust the rate charged to IUPUI, the Commission cited basic facts to support its conclusion that rate discrimination was reasonable, but then presented no such facts to support the rate charged. The rate differential involved here is substantial, with IUPUI paying a rate of $.75 per one thousand pounds of steam and the Intervenors paying rates ranging from $3.00 to $5.64 per one thousand pounds of steam. Further, IPALCO's witnesses stated on cross-examination that IPALCO may not be receiving a full rate of return on the service to IUPUI.[8] In light of these circumstances, we must remand this case to the Commission for further findings in support of its conclusion that the rate specified in the contract is not unduly discriminatory.

C.

The Commission refused to accept Intervenors' third adjustment which have included in the test year set out in the Commission's prehearing order certain interest and debt expenses associated with a proposed sixty million dollar bond issue. Intervenors argue that this is a violation of the prehearing order making the Commission's final order contrary to law.

The portion of the prehearing order fixing the test year to be used reads as follows:

"2. The 'cut-off date' for purposes of accounting, financial and

---

8. Although this factor is in itself not unlawful where there are reasonable grounds to support such a deficiency, there are no findings in the Commission's final order which would allow us to judge the reasonableness of any alleged deficiency. *See L.S. Ayres & Co. v. Indianapolis Power & Light Co., supra.*

engineering evidence and for determining the fair value of Petitioner's steam utility properties in service and used and useful in rendering service to the public shall be April 30, 1975.

3. The accounting method to be utilized in the preparation of financial and accounting exhibits to be introduced into evidence herein shall be the going level basis adjusted to reflect changes that as of April 30, 1975, are fixed, known, and measurable and which have or will become effective within twelve (12) months of April 30,1 975; except that real and personal property tax calculations may include two (2) pro forma years for expense determinations."

The above order fixes April 30, 1975, as the termination date of the historical test year. In September of 1975, IPALCO issued sixty million dollars in first mortgage bonds. Intervenors contend that the language of the above prehearing order takes in changes which occurred either within the test year or which occurred within the twelve month period after the test year. With that contention we must disagree. The language of the order clearly states that only those changes which are fixed and known within the test year are to be included within the test year. The second twelve month period to which reference is made in the order is intended to take in those changes which were definite, fixed, and ascertainable within the year year but which for some reason did not become effective or were not consummated until after the test year was over. An example of such a change would be a wage increase which was granted in a labor contract signed within the test year but which did not become effective until after the test year.

It is clear from the testimony of Zane Todd, President of IPALCO (whose testimony is expressly accepted by Intervenors in their brief) that the bond issue was not a change which had become "fixed, known and measurable" within the test year:

"What, if any, are the present financing plans of the Company?

(a) In Cause Number 34136 filed with this Commission on *June 26, 1975*, Petitioner [IPALCO] asked to issue and sell not to exceed $80,000,000 of First Mortgage Bonds in 1975. *The Company has now determined to sell only $60,000,000 of First Mortgage Bonds*, in an effort to protect its bond rating." (Emphasis added). (Testimony prefiled September 4, 1975).

The above testimony shows that while it was known before the end of the test year that IPALCO intended to float a bond issue (and also an issue of common stock in early 1976), not even the size of the issue was fixed or measurable, let alone the expenses connected with such an issue. Therefore, because the expenses connected with the bond issue were not "fixed, known and measurable," such expenses were not within the ambit of the prehearing order.

Furthermore, the selection of a test year and the proper adjustments to be made to that year are technical issues of rate-making policies. Presumably, the Public Service Commission has much more expertise and experience in the area of utility regulation and rate-making than does the judiciary, which is why our General Assembly has left such tasks with that Commission rather than the courts. Our review of the Commission's actions in selecting and adjusting a test year is limited to an appraisal in each case as to whether or not its decision is reasonable under the circumstances. *See L.S. Ayres & Company v. Indianapolis Power & Light Company, supra.* Intervenors have not specifically pointed out how the refusal of the Commission to include the bond issue expense was unreasonable under the circumstances. Further, Intervenors' witness Drees, who advocated the inclusion of the bond issue expense, also admitted under cross-examination that if the bond issue expense were included in the test year, then other adjustments, such as wage increases, might also be included. Therefore, it was properly within the discretion of the Commission to decide which adjustments would or would not be made, and we find no persuasive evidence to show that the Commission's decision was unreasonable.

## D.

The final adjustment advanced by Intervenors and rejected by the Commission would have changed the treatment of a "negative" tax attributable to Allowance for Funds Used During Construction (AFUDC) so as to allow that figure to be used as an above-the-line account (as an operating expense credit) thereby increasing income and decreasing rates. Intervenors argue that this is in violation of the Uniform System of Accounts, which was to be used under the prehearing order, and that therefore the Commission again violated its own prehearing order.

The Uniform System of Accounts, which was prescribed for use by the Commission in its prehearing order, contains a method of accounting for electrical utilities promulgated by the Federal Power Commission. The portion of that accounting system relating to class A and B utilities (which include IPALCO) is found at 18 CFR part 101. Although no distinct system is provided for steam utilities, IPALCO has consistently used the uniform system for electric utilities in keeping all of its books and records because it is predominantly an electric utility. Intervenors have made no objection to the use of this system either by the Commission or IPALCO.

As with most utilities, IPALCO is constantly engaged in a number of construction projects which are needed to modernize its operation and keep pace with the increasing demand for energy. In computing the costs of these projects IPALCO computes the cost of financing the project, which is basically the interest charges, and records that cost as AFUDC. This cost is then added to the cost of the construction project, increasing plant values, and also provides a deduction for federal income tax purposes. While this deduction reduces IPALCO's income for tax purposes (a negative tax), it is not used as an operating expense credit for rate-making purposes (it does not decrease rates).

Intervenors argue that such use of AFUDC is improper under the Uniform System of Accounts in that the negative tax attributable to AFUDC should be used as an above-the-line account so as to increase operating income. In support of this contention, Intervenors cite the testimony of their expert witness, Drees, and Account 409.2 of the uniform system, which reads as follows:

"409.2 Income taxes, other income and deductions.

This account shall include the amount of those local, state and federal income taxes (both positive and negative), which relate to Other Income and Deductions."

We do not agree with the contention of Intervenors that the Commission erred in considering Account 409.2 to be a nonoperating account, thereby excluding it for rate-making purposes. The langauge of the account itself refers to elements relating to Other Income and Deductions rather than Utility Operating Income and is in fact classified

as such under the Income Accounts of the Uniform System of Accounts for Class A and Class B public utilities. Furthermore, Drees himself admitted that Account 409.2 related to Other Income and Deductions, a nonoperating account, and was therefore a below-the-line account.

Intervenors also cite the special instructions to Accounts 409.1, 409.2 and 409.3 as mandating the allocation of the negative tax to operating income rather than other income and deductions:

> "B.   The accruals for income taxes shall be apportioned among utility departments and to other Income and Deductions so that, as nearly as practicable, each tax shall be included in the expenses of the utility department or Other Income and Deductions, the income from which gave rise to the tax."

With this contention we also cannot agree, for the above portion of the special instructions is ambiguous at best and cannot support the conclusion that the Commission's determination is contrary to law. The special instructions to this account and to the other accounts are very specific instructions not intended for broad interpretation. While the above instruction when quoted out of context does give rise to the inference that the accrual of the negative income tax must be allocated to the source of the income giving rise to the tax (the operating income of the utility), we do not feel that such an inference can be drawn when the examining viewpoint focuses upon the entire text. In any event, the opposite inference drawn by the Commission cannot be held to be unreasonable or unsupported by the evidence, and therefore cannot be disturbed on appeal.

Under present theories of utility rate regulation, the rate paying consumer is required to pay for all operating costs of the utility such as wages, taxes, interest, fuel costs, etc., through the rates he is charged by the utility. That rate must also include a reasonable return on capital invested in the utility which is necessary to provide the plant and equipment used and useful in generating the utility services. This rate of return is then paid out on capital in the form of dividends and interest to the utility's shareholders and bondholders in return for their investment. The total cost of a utility, then, is split between the investors and the consumers, with the former bearing the cost of building and purchasing new plant and equipment and the latter sharing the costs

of operating the plant and equipment to generate the desired services.

The Intervenors rely primarily on the testimony of their expert witness Drees in support of their position as to the AFUDC account. The thrust of his testimony seems to be that this account sould be used as an above-the-line account in order to pass on the tax benefit to the rate paying customer. He reasons that the negative tax which is left in the hands of IPALCO is effectively used as operating income and should therefore be used as such in computing operating income for rate-making purposes. By using AFUDC as a below-the-line account, Drees argues, IPALCO is in effect forcing its customers to pay twice for the same amount of tax: (1) First by not allowing a credit against operating income for the negative tax, which would increase operating income and decrease rates; and (2) by allowing the cost of AFUDC to be capitalized and brought into the rate base, where it will again be paid by the customer.

The fallacies of Intervenors' arguments are displayed in the findings of the Commission. The fund which Intervenors would allocate for the benefit of customers has as its source, for the most part, the savings in federal income tax resulting from the deductions for interest charges accrued on funds borrowed for construction. This interest, which is the source of tax savings, is in fact a cost of capital and not an operating cost. As explained above, this is a cost which must be borne by the investor and not the customer. Further, the Commission is prohibited from including the value of the construction work in progress in the utility's rate base, for such property has not yet achieved the status of property "*actually used and useful* for the convenience of the public." IC 1971, 8-1-2-6 (Burns Code Ed.) (Emphasis added). Because the construction work in progress is not included in the rate base, the customer is not paying any return on the investment. Therefore, since the customer is neither contributing to the costs of work in progress nor paying any return on the investment in that work, he should not be entitled to the tax benefits associated with the construction costs. Those benefits should in fact be passed on to the investor as a return on his capital. *See Arkansas Power and Light Company v. Arkansas Public Service Comm.* (1977), Ark., 546 S.W.2d 720; *Pennsylvania Public Utility Commission v. Pennsylvania Electric Company* (Penn. 1973), 1 P.U.R.4th 272.

We must also reject Intervenors' argument that they are penalized by allowing IPALCO to capitalize the negative tax attribute to AFUDC, for they overlook the fact that only the net costs of AFUDC, i.e., interest costs minus the income tax savings attributable to the interest deduction, is capitalized. This fact was established by the unrebutted testimony of John Wilson, assistant controller for IPALCO, as follows:

"Q. Now, when the rate at which Allowance for Funds is capitalized, is fixed as a net rate, as you've described, in your opinion are the rate paying customers being deprived of some deduction to which they would otherwise be entitled?

A. No, they are not.

Q. Explain, please.

A. When you record a net of tax rate you're effectively reducing your rate base. In other words, *the Allowance for Funds portion [AFUDC] is on a net interest cost basis*. This reduces the rate base on which the rate-payer pays his electric rates. He also gets a deduction, book depreciation, for this Allowance for Funds." (Emphasis added).

Finally, Intervenors cite *L.S. Ayres & Co. v. Indianapolis Power & Light Co., supra,* as authority for its position on AFUDC. However, the portion of that case cited by Intervenors concerns a deferred tax expense reserve account used by IPALCO to deal with the effects of deferred tax liability due to accelerated depreciation of plant and equipment and does not concern the AFUDC account. Furthermore, the tax reverse account in the *Ayres* case was being included in IPALCO's rate base. Such is not the case with the AFUDC account and the *Ayres* case is therefore not applicable.

Although Intervenors' position on this issue is not without merit, we cannot say that the Commission erred in not adopting that position. The conclusion to reject this adjustment is reasonable and supported by substantial evidence, and is therefore affirmed.

## ARGUMENT VII

## FAIR RATE OF RETURN

Intervenors next attack the findings of the Commission as to the rate of return allowed to IPALCO as set forth in its final order in Findings Number 8 and 9.

In its Finding Number 8, the Commission delivered its basic findings as to a fair rate of return on capital, and discussed both Intervenors' and IPALCO's evidence. One of the reasons cited by the Commission in its finding in rejecting Intervenors' evidence was the failure of Intervenors to take into account additional equity capital which was to be issued in early 1976. Intervenors argue that the findings of the Commission are inconsistent and therefore contrary to law in that the Commission refused to consider Intervenors' evidence on certain expenses occurring outside the test year which related to operating income but yet considered evidence of a stock issue outside the test year for purposes of computing a fair rate of return.

As we have already stated, the purpose for using a test year in rate-making cases is to establish a fixed period of time from which the calculations can be made which are necessary to set proper operating rates. This requires that the data used in such computations provide an accurate prediction of the utility's operation during the period in which the rates will be in effect. In using a test year, it is the duty of the Commission to compute rates that are fair and just both to the utility and to its customers, not only at the time the order is made but also for a reasonable period of time thereafter. *New England Telephone and Telegraph Company v. State* (1973), 113 N.H. 92, 302 A.2d 814.

The question as to which and how many adjustments should be made to the test year is directly linked to the fact finding duty of the Commission, for it involves issues of regulatory policy which can vary from case to case, depending on the facts of each particular situation. *Southern Indiana Gas, supra.* On the one hand, rigid adherence to the limits of the test year often can lead to results substantially devoid of any predictive value. On the other hand, the allowance of excessive adjustments can destroy the usefulness of the test year as a historical model, leaving results which are so unreliable that they are not worthy of consideration. Therefore, the Commission must be left with a large degree of discretion as to the extent and types of adjustments to be made to the test year, providing, of course, that there is substantial evidence in the record to support

the Commission's actions. *Southern Indiana Gas, supra; City of Pittsburgh v. Pennsylvania Public Utility Commission* (1956), 182 Pa. Super. 551, 128 A.2d 372.

The record evidence shows that in refusing Intervenors' evidence concerning out of period expenses for purposes of computing operating income, the Commission also refused to consider other out of period expenses, such as wage increases, that would have been beneficial to IPALCO. By doing so, the Commission was consistent in refusing to consider evidence of out of period adjustments to operating income. Conversely, the Commission allowed evidence from all parties as to new capital stock to be issued outside of the test year for purposes of computing a fair rate of return. In fact, the evidence of both Intervenors and IPALCO as to the cost of capital included adjustments for out of period changes. On this basis, we can see no inconsistency in the Commission's findings. The Commission's rejection of out of period adjustments to operating income and acceptance of such adjustments to cost of capital calculation is properly within its discretion, and Intervenors have failed to demonstrate how the decision of the Commission is unreasonable under the circumstances.

Intervenors next take issue with the following statement in the Commission's Finding Number 8:

"The Company's requested return of 6.9% on a 135% fair value rate base is below this level."

Intervenors argue that the 135% figure is unsupported by the record and that the Commission is not authorized to use such a figure by any statute or provision of the law. However, the Commission was not relying on that figure but instead was merely referring to a portion of the testimony of one of IPALCO's witnesses.

Finally, Intervenors argue that the Commission's computation of a fair rate of return is unsupported by the evidence. However, their argument in effect is asking us to weigh the evidence and choose the evidence of Intervenors over that of IPALCO, which we cannot do. The evidence introduced by IPALCO fully supports the Commission's findings and we must therefore affirm its decision.

## ARGUMENT VIII

## ROLL-IN OF FUEL ADJUSTMENT

In their final argument, Intervenors attack the rates and rate structure that was initiated by IPALCO. They first argue that the Commission erred by allowing IPALCO to "roll in" an average of prior fuel adjustment charges to the rate base. Secondly, Intervenors contend that the final rates filed by IPALCO exceed the percentage increase specified in its petition for the increase. Finally, it is alleged that the Commission illegally ignored the statutory procedure for effecting a rate increase.

Intervenors have cited IC 1971, 8-1-2-6 (Burns Code Ed.), which relates to valuation of a utility's property in order to calculate rate base, as authority for its contention that a fuel adjustment clause cannot be rolled into the rate base. However, we must agree with IPALCO that the Commission in its final order did not approve a roll-in of fuel adjustment charge to *rate base*, but rather approved a roll-in of the fuel charge to the *base rates*. We believe this is adequately shown in the findings of the Commission:

> "Petitioner's undisputed evidence in this cause (Petitioner's Ex. 9, Sch. 2, p. 7) establishes its *pro forma* fuel costs and *pro forma* fuel recovery revenues. Such costs are proper and allowable operating expenses and in calculating Petitioner's *pro forma* revenues at present rates such additional fuel recovery revenue has been included. Therefore, the rates to be filed by Petitioner pursuant to this order should roll in its existing fuel adjustment charges, and the base fuel factor in such rates should be set at Petitioner's average fuel cost for the most recent twelve month period."

We agree that fuel charges are not properly a part of the rate base, i.e., the fair value of a utility's property upon which a return is allowed. However, a fuel charge, i.e., a charge which corresponds to the increasing price of fuel, is properly included as an operating expense. The effect of rolling in the fuel charge was merely to restructure the tariff prices (rate schedule) to include the fuel adjustment charges already charged as a separate entity and to fix the base from which future fuel charges would be made.

Intervenors also allege that the new rate schedule that was filed by IPALCO and which increased the rates pursuant to the Commission's order is illegal in that it allows a rate increase that exceeds the increase requested in IPALCO's petition. It appears that the source of this alleged wrong is again the rolled in fuel charge. Intervenors have provided us with a series of computations which allegedly show that IPALCO's new rate schedule places into effect a rate increase which grossly exceeds the 30.5% increase requested in its petition.

We first note that it is unnecessary for this court to delve into an investigation as to whether or not the rate increase granted by the Commission matches the increase requested in IPALCO's petition. When a petition is filed with the Commission by a public utility alleging its rates to be inadequate, it becomes the duty of that agency to investigate that charge, determine whether the rates are indeed inadequate or unjust and then order new rate schedules that alleviate any unjust rates that are discovered. IC 1971, 8-1-2-68 (Burns Code Ed.). In doing so, the Commission is not bound by the request or recommendations of the utility, but is to use its own discretion. *State ex rel. Public Service Commission v. Boone Circuit Court* (opinion on rehearing) (1957), 236 Ind. 202, 138 N.E.2d 4, 139 N.E.2d 552.

More importantly, we have examined the mathematics advanced by Intervenors and have found nothing which would indicate that the new rates filed by IPALCO will produce a return in excess of that which was ordered by the Commission. IPALCO's proposed increased rates were prefiled as Exhibit 12 and were admitted without objection. From these rates, IPALCO calculated its figure of $2,236,605 as income available for return. As was mentioned above, the Commission found a fair return to be $2,169,256, which figure is only slightly less than that proposed by IPALCO. The Commission then ordered IPALCO to uniformly reduce its proposed rates so as to reflect the reduction in income available for return. The rate schedule which IPALCO filed with the Tariff Division pursuant to the Commission's order reflects a corresponding across-the-board reduction in steam service rates and it thus appears that the new rate schedule is in compliance with the Commission's order.

Intervenors lastly contend that the Commission erred by failing to provide a hearing on the new rates and by allowing the new rate schedule to become effective immediately after its approval by the tariff division, in violation of IC 1971, 8-1-2-42 (Burns Supp. 1977).[9] However, under the circumstances related above, we do not see how any useful purpose could have been served by a further hearing on IPALCO's rate schedules. Intervenors had ample opportunity to object to the proposed rates which were substantially the same as the approved rates. We also feel that IC 1971, 8-1-2-42 (Burns Supp. 1977) was satisfied in that the rate schedule approved by the Commission was filed in September, 1975, some six months before the effective date of the increase.

This case is remanded to the Commission for further findings as to the rates charged under the IUPUI contract. In all other respects the decision of the Commission is affirmed.

Garrard, P.J., Participating by designation, concurs.

Hoffman, J., Participating by designation, concurs.

NOTE—Reported at 375 N.E.2d 616.

---

9. The pertinent portion of that statute reads as follows:

"No change shall thereafter be made in any schedule, including schedules of joint rates, except upon thirty [30] days' notice to the commission and approval by the commission and all such changes shall be plainly indicated upon existing schedules or by filing new schedules in lieu thereof thirty [30] days prior to the time the same are to take effect. The commission, upon application of any public utility, may prescribe a less time within which a reduction may be made."