**BETHLEHEM STEEL CORPORATION, Inland Steel Company, National Steel Corporation (Midwest Steel Division), Youngstown Sheet and Tube Company, Air Products and Chemicals, Inc., and Union Carbide Corporation, Appellants (Intervenors Below),**

v.

**NORTHERN INDIANA PUBLIC SERVICE COMPANY, Appellee (Petitioner Below),**

**City of Gary, Indiana, United States Steel Corporation, Appellees (Intervenors Below),**

**Public Service Commission of Indiana, Larry J. Wallace, William B. Powers and James Plaskett, as Members of the Public Service Commission of Indiana, Frank J. Biddinger, Public Counselor of the State of Indiana, Appellees.**

**No. 2–1075A305.**

Court of Appeals of Indiana, Second District.

Dec. 4, 1979.

Paul Hirsch, Haymaker, Hirsch & Fink, Indianapolis, for appellant, Bethlehem Steel Corp.

Karl J. Stipher, Fred E. Schlegel, Michael J. Huston, Baker & Daniels, Indianapolis, for appellants, Inland Steel Co., National Steel Corp. (Midwest Steel Division), Youngstown Sheet and Tube Co., Air Products and Chemicals and Union Carbide Corp.

Edmund A. Schroer, Joseph T. Morrow, David C. Jansen, Schroer, Eichhorn & Morrow, Hammond, for appellee, Northern Indiana Public Service Co.

J. Robert Miertschin, Jr., Gary, for appellee, City of Gary.

Kenneth R. Pepperney, Law Dept., U. S. Steel Corp., Pittsburgh, Pa., for appellee, U. S. Steel Corp.

Frank J. Biddinger, Theodore L. Sendak, Atty. Gen. of Indiana, Indianapolis, for appellees, Public Service Commission of Indiana, and Larry J. Wallace, William B. Powers and James Plaskett, as Members of the Public Service Commission of Indiana.

BUCHANAN, Chief Judge.

## CASE SUMMARY

Intervenors-appellants, Bethlehem Steel Corporation, Inland Steel Company, National Steel Corporation (Midwest Steel Division), Youngstown Sheet and Tube Company, Air Products and Chemicals, Inc., and Union Carbide Corporation (hereinafter referred to as Industrial Intervenors) are seeking judicial review of an order of the Public Service Commission (Commission) issued October 6, 1975, which, *inter alia*, approved rates to produce additional revenues to Appellee Northern Indiana Public Service Company (NIPSCO) of $50,152,051, annually.

The Industrial Intervenors have raised numerous issues, but the primary, overriding one is whether the order of the Commission is insufficient, unreasonable and unlawful and whether there was substantial evidence to support the findings of fact upon which the order rested.

We affirm.

## FACTS

Construing the evidence most favorable to the Commission's order, the facts are:

NIPSCO is a public utility corporation operating gas and electric properties in thirty counties in northern Indiana. As of December 31, 1974, NIPSCO served electric energy to approximately 336,000 customers residing in 241 towns and communities in 21 counties in northern Indiana at both wholesale and retail. NIPSCO's retail electric business is regulated by the Commission. Its wholesale business, which is less than 3

percent of its total business and includes power service to municipalities in Rural Electric Membership Corporations, is regulated by the Federal Power Commission.[1]

On November 22, 1974, NIPSCO filed a petition with the Commission for authority to increase its electric utility rates and the composite rate of depreciation applied to its property. The amount of rate increase initially sought by NIPSCO in the petition as filed was $53,854,354. The depreciation rate was requested to be increased from a composite rate of 2.7 percent to 3 percent. The increase in the depreciation rate is not an issue in this appeal.

Subsequent to the filing of the petition the following events took place:

| Date | Event |
| --- | --- |
| 12/17/74 | Prehearing conference held by the Commission. |
| 1/ 3/75 | The Commission issued its prehearing order which ordered, *inter alia*, the following: |

1. The "cut-off" date for purposes of accounting and engineering evidence to be presented at the hearing herein and for determining the fair value of petitioner's [NIPSCO] plant used and useful in service to the public shall be December 31, 1974.

2. The "test year" to be used in determining petitioner's actual and adjusted operating revenues, expenses and profit or loss under its present rates and for determining the effect of its proposed rates shall be the twelve (12) months ended December 31, 1974.

3. The accounting method to be utilized in the preparation of the financial and accounting statements to be introduced into evidence herein shall be the adjusted year basis limited to adjustments that are known, fixed and measurable within twelve (12) months ended December 31, 1974 except the computation of real estate taxes shall be adjusted through December 31, 1976.

| 3/14/75 | NIPSCO filed its testimony and exhibits constituting its case-in-chief pursuant to the prehearing order. |

1. The Commission, in this hearing, was only concerned with NIPSCO's production of retail electrical energy and did not take into consideration in its valuations the equipment used for or the cost of producing gas energy or wholesale electrical energy; the latter is under the jurisdiction of the Federal Power Commission. Equipment, costs and revenue for gas and wholesale electrical energy was designated as non-jurisdictional. Retail electrical production was designated as jurisdictional.

| Date | Event |
| --- | --- |
| 5/19–<br>5/22/75<br>and 6/6–<br>6/ 7/75 | Public hearings held in Indianapolis and NIPSCO's case-in-chief presented to the Commission. The witnesses of NIPSCO were cross-examined. |
| 7/ 7/75 | The Public and the Industrial Intervenors filed their testimony and exhibits with the Commission. |
| 7/14/75 | Public field hearings held in Crown Point, Gary and Hammond. |
| 7/16–<br>7/18/75 | Public hearings reconvened for the presentation of the case-in-chief of the Public and Industrial Intervenors. The witnesses of the Public and the Industrial Intervenors were cross-examined. |
| 10/ 6/75 | The Commission issued its order granting NIPSCO an increase of $50,152,051. |
| 10/ 7/75 | NIPSCO filed new rate schedules with the Engineering Department of the Commission pursuant to October 6, 1975 order. |

During the hearing, certain facts concerning NIPSCO's financial condition and need for a rate increase were established.

NIPSCO's rate of return on the fair value of its property based on the test year was 3.915 percent, which was testified to be an unreasonably low figure.

During the test year due to the cash drain caused by financing NIPSCO's huge construction expenditures,[2] NIPSCO did not generate enough capital from operations to pay its interest and dividends except for the cash generated by deferred taxes and depreciation.

Also due to the cash drain caused by the required capital expenditures NIPSCO was in the position of having to issue additional securities to service its existing securities. These securities were issued at costs far in excess of the allowed rate of return. NIPSCO issued $75,000,000 of Series V Bonds at 8.90 percent interest, $50,000,000 of Series W Bonds at 10.40 percent interest, and $20,000,000 of cumulative preference stock with a dividend rate of 11.64 percent during 1974.

2. NIPSCO spent $152,589,739 for construction in calendar year 1974 ($126,012,198 for electric projects). For the years 1975–1978 the evidence indicated that NIPSCO would spend $923,500,000 of which $799,100,000 is for the construction of electric generating, transmission, and distribution equipment facilities, including substantial sums to provide environmental protection equipment.

NIPSCO's first mortgage indenture requires an earnings coverage of at least 1.7 times annual interest requirements in order for NIPSCO to issue new bonds. At December 31, 1974, this coverage was 2.31. In 1968 it had been 5.76. Testimony at trial indicated that this coverage should be 3 times the annual interest requirements.

During the test year NIPSCO stock sold as low as $11.75. Its book value at December 31, 1974, was $17.19. Testimony at trial indicated that sale of stock below book value is unacceptable.

NIPSCO has a responsibility to serve its customer's requirements and because of an increase in demand it has been forced to expand. In order to compete with others in the financial market to attract the large sums of money required to finance its construction program, it is essential for NIPSCO to receive an adequate return on its capital.

It was established at the hearings and found by the Commission that during the test year, the Industrial Intervenors had purchased 51.26 percent of NIPSCO's total jurisdictional kilowatt hour sales from which NIPSCO derived 31.35 percent of its total jurisdictional electric revenues. If the proposed rates had been in effect during the test year, the revenues from the Industrial Intervenors for the same sales would have constituted 37.62 percent of NIPSCO's total jurisdictional electric revenues. The average cost per kilowatt hour to the Industrial Intervenors as of December 31, 1974, was 1.445 cents. At the proposed rates the average cost per kilowatt hours to Industrial Intervenors would be 2.07 cents as compared to residential customers' average cost per kilowatt hour of 3.928 cents and commercial customers' average cost per kilowatt hour of 4.707 cents.

The hearing, covering a period of two months, resulted in a record which spreads over 4,252 pages and 9 volumes of transcript. The parties submitted numerous exhibits and introduced a great deal of testimony to support their respective positions. In turn the Commission produced an extensive order with complete findings, citing exhibits, testimony and applicable statutes.

The Commission's order allowed a rate increase, but not to the extent requested by NIPSCO. NIPSCO had initially requested to increase its revenue by $53,854,354; during the course of the hearings, NIPSCO increased its request to $61,499,987. The Commission granted an increase of $50,152,051. Additionally, the Commission ordered NIPSCO to decrease its proposed rate design as follows:

| Customer Classification | Petitioned Increase Percent | Ordered Increase Percent |
|---|---|---|
| Gen. Residential | 14.88 | 10.21% |
| Total Residential | 15.83 | 11.14 |
| Total Commercial | 14.16 | 9.59 |
| Municipal Power | 9.28 | 5.01 |
| Total Municipal | 9.78 | 5.49 |
| Rate 702 | 42.24 | 36.51 |
| Rate 703 | 45.31 | 39.36 |
| Total Power | 34.34 | 28.90 |

## ISSUES

The issues may be consolidated as follows:

1. Whether the Commission's determination of the *fair value rate base* was proper and supported by sufficient evidence in the record.

2. Whether the Commission properly determined NIPSCO's *rate of return* based on its fair value rate base.

3. Whether the Commission adequately considered and made a proper finding on the *income tax related issues.*

4. Whether the Commission allowed for the correct *cost of service and revenue adjustments.*

5. Whether the Commission acted properly in adopting the *rate design* proposed by NIPSCO.

6. Whether the proper *procedure* was followed in (a) the adoption of the *test year* and the *adjusted year method*; (b) the *notice* given by NIPSCO of its proposal for a rate increase; (c) the denial by the Commission of the Industrial Intervenors' request for an *additional hearing* on the rate schedule adjustments filed by NIPSCO pursuant to the Commission's October 6, 1975 order.

## DECISION

In reviewing decisions of the Public Service Commission, this Court recognizes the Commission's expertise.

Orders of the Public Service Commission and rates approved therein are presumed valid. *Public Service Commission v. Indiana Bell Telephone Co.* (1956), 235 Ind. 1, 130 N.E.2d 467. The Industrial Intervenors, as appellants, have the burden to show that the determination and order of the Commission was unreasonable or unlawful.

The appropriate standard of judicial review for the Commission's factual determinations is prescribed by statute. *Ind.Code* 8–1–3–1 provides a two-tier standard of review:

An assignment of errors that the decision, ruling or order of the commission is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the decision, ruling or order, and the sufficiency of the evidence to sustain the finding of facts upon which it was rendered.

So the Industrial Intervenors have the burden of showing there is insufficient evidence in the record to support the findings of the Commission; they cannot merely cite to this court other evidence in the record which would support a determination more favorable to their position. *Southern Indiana Gas and Electric Co. v. Southern Indiana Rural Electric Cooperative, Inc.* (1979), Ind.App., 386 N.E.2d 1017. It is not within the province of this court to substitute our judgment for that of the Commission. *Public Service Commission v. City of Indianapolis* (1956), 235 Ind. 70, 131 N.E.2d 308.

Justice Arterburn clearly described the appropriate judicial review in *Public Service Commission v. Indiana Telephone Corp.* (1957), 237 Ind. 352, 368, 146 N.E.2d 248, 256:

The Public Service Commission performs a legislative function and is not a part of the judicial division of our government.

"The purpose of a judicial review of an administrative order by the court is not to decide the matter on the merits for the administrative body but rather solely to determine whether or not the order made by the administrative body was outside the limits and jurisdiction of such body. Once the matter of jurisdiction is determined the court has no further right to interfere with an administrative procedure which belongs to another department of the government—not the judiciary. As a court we have no right to substitute our judgment on the merits of an issue before an administrative body acting within its jurisdiction.

\*    \*    \*    \*    \*    \*

"The remedy for any disappointment or unsatisfactory results before an administrative body which is acting within its jurisdiction is with the Legislature and not the courts." (citing *Public Service Commission v. Chicago, Indianapolis and Louisville Railway Co.* (1956), 235 Ind. 394, 404–05, 134 N.E.2d 53, 54.) (opinion on rehearing).

## I.

## FAIR VALUE RATE BASE

*ISSUE* — Whether the Commission's determination of the fair value rate base was proper and supported by sufficient evidence.

*PARTIES' CONTENTIONS.*—The Industrial Intervenors cite numerous errors in the testimony presented by NIPSCO and contend that the findings of the Commission on the fair value rate base were based on insufficient evidence.

NIPSCO responds that the Commission properly determined the fair value rate base on substantial evidence and that the Industrial Intervenors have shown no significant error on the part of the Commission.

*CONCLUSION*—The Commission's determination of the fair value rate base was proper. The record contains substantial probative evidence on this issue.

The Commission's primary objective in every rate proceeding is to establish a level

of rates and charges sufficient to permit the utility to meet its operating expenses plus a return on investment which will compensate its investors. The criterion by which the reasonableness of utilities rates is judged is whether or not the rates enable the utility under efficient management to maintain its utility property and service to the public and produce a reasonable return on the fair value of its used and useful property (fair value rate base). *L. S. Ayres & Co. v. Indianapolis Power & Light Co.* (1976), Ind.App., 351 N.E.2d 814; *City of Evansville v. Southern Indiana Gas & Electric Co.* (1975), Ind.App., 339 N.E.2d 562.

At the outset, then the Commission must value the utility's used and useful property. In doing so it is governed by *Ind.Code* 8–1–2–6 which provides:

The commission shall value all property of every public utility actually used and useful for the convenience of the public at its *fair value giving such consideration as it deem appropriate* in each case to all bases of valuation which may be presented or which the commission is authorized to consider by the following provisions of this section.[3] (emphasis added).

Pursuant to the statute and case law interpreting it, NIPSCO presented evidence through its officers, outside consultants, and engineers to establish the value of its property used and useful in the production of electricity.

In finding that the evidence presented was sufficient, we are guided by the standards set out by the Indiana Supreme Court in *Public Service Commission v. City of Indianapolis*, 325 Ind. at 95, 131 N.E.2d at 318, which stated:

The "fair value" testimony of the various witnesses is nothing more than their conclusions on an *ultimate issue which is the duty of the Public Service Commission to determine from all the evidence present-*

ed. "Fair value" is a conclusion or final figure, drawn from all the various "values" or factors to be *weighed in accordance with the statute by the Commission.* (emphasis added).

■ In Finding 3 the Commission made a determination of NIPSCO's electric property and service used and useful. In Finding 4 the Commission made specific determinations of the values of NIPSCO's electric properties in detail to reach a figure of not less than $829,496,028, as representing the fair value of the used and useful property for the production of electricity.

These findings were based on extensive testimony as presented by NIPSCO. First, Dean H. Mitchell, Chairman of NIPSCO, gave his reasoned opinion of the fair value of NIPSCO's used and useful electric property. Then, H. P. Lyle, NIPSCO's Vice President, Electric Production and Engineering, described in detail NIPSCO's electric system, including the steam generating plant, transmission system and distribution system. Lyle's testimony was followed by that of Richard L. Johnson, President of Middle West Service Company, a utility engineering consulting firm, who testified to the reproduction cost new less depreciation valuation of NIPSCO's electric utility properties in service used and useful. And Leonard J. Kujawa, partner in the accounting firm of Arthur Anderson & Co., testified as to the value of NIPSCO's plant as adjusted to account for inflation.

■ The ultimate determination of the fair value rate base is committed to the discretion of the Commission after weighing all the evidence. *Public Service Commission v. City of Indianapolis, supra.* To the extent that the Industrial Intervenors suggest that some figure identical to that fixed by the Commission must be specified in the evidence, it is in error. Similarly, no

---

**3.** Two standard methods are utilized to value the property included in the rate base: (1) the "original cost" method which is based on book value (the cost of an asset when first devoted to public service), or (2) the "fair value" method which takes into account the declining purchasing power of the dollar through "reproduc-

tion costs new" studies utilizing price indices or other measurements of an investment's current value. The Indiana statutory scheme authorizes the use of either valuation method, *see L. S. Ayres & Co. v. Indianapolis Power & Light Co., supra; City of Evansville v. S. Ind. Gas & Elec. Co., supra.*

case establishes the proposition that in fixing the fair value rate base every item of the utility's property must be valued in the order. *Capital Improvement Board of Managers v. Public Service Commission* (1978), Ind.App., 375 N.E.2d 616. The Commission was, however, quite detailed in its explanation of its derivation of the rate base figure. It articulated the policy it used in determining the fair value figure and further assigned values to a number of rate base components which it valued separately.

The Commission's finding of the fair value rate base is substantiated by the evidence.

## II.

## RATE OF RETURN

*ISSUE* — Whether the Commission properly determined NIPSCO's rate of return based on its fair value rate base.

*PARTIES' CONTENTIONS*—The Industrial Intervenors contend that the rate of return conclusion of the Commission is unsupported inasmuch as the Commission made no determination concerning NIPSCO's cost of capital and the evidence presented by NIPSCO was incomplete.

NIPSCO responds that it presented sufficient evidence of probative value and that the Industrial Intervenors are merely asking this court to reweigh the evidence.

*CONCLUSION*—The Commission's finding on NIPSCO's rate of return is sufficiently detailed and is based on substantial evidence in the record.

The Commission, in Finding 5, established that the fair rate of return for NIPSCO should not exceed 7.15 percent. The Commission stated that it had based this finding of the fair rate of return by considering the evidence presented at the hearing, cost of capital changes, current money market conditions, and financial factors affecting NIPSCO. This court has established in both *L. S. Ayres & Co. v. Indianapolis Power & Light Co., supra,* and *City of Evansville v. Southern Indiana Gas &*

*Electric Co., supra,* that the Commission must exercise its discretion in choosing an appropriate figure for rate of return. The court in both cases quoted from *Bluefield Waterworks and Improvement Co. v. Public Service Commission* (1923), 262 U.S. 679, 692, 43 S.Ct. 675, 679, 67 L.Ed. 1176, 1182, which held:

What annual rate will constitute just compensation depends upon many circumstances and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts.

In our review of this finding we have looked to the record and have found in the testimony of Dr. Henry Herz evidence to support the rate of return established. In addition, we acknowledge the proficiency and expertise of the Commission in reaching this determination. Moreover in articulating the factors which it took into account in setting the rate of return figure, the Commission's finding was sufficient. *Capital Improvement Board of Managers v. Public Service Comm., supra.* Thus, we can find no error in the Commission's finding on the fair rate of return.

## III.

## INCOME TAX RELATED ISSUES

*ISSUE* — Whether the Commission adequately considered and made a proper finding on the income tax related issues.

*PARTIES' CONTENTIONS*—The Industrial Intervenors contend that the Commission's decisions on various income tax adjustments and other related issues especially normalization were in error.

NIPSCO replies the Commission's decisions were reasonable and supported by substantial evidence.

*CONCLUSION*—The Commission's findings on the income tax related issues were reasonable and complete and were based on sufficient evidence.

The Industrial Intervenors raised various tax related costs of service issues in hearings before the Commission. The trial of

these issues occupied a major portion of the hearings and the Commission devoted a considerable section of its order to the resolution of these issues.

■ The essence of the Industrial Intervenor's argument is that NIPSCO is overstating its federal income tax expense; an increase in its expenses will cause NIPSCO to be allowed a higher rate of return by the Commission. The Industrial Intervenors argue that the various adjustments for tax interest expenses, tax rates of depreciation, and deferred taxes, which the Commission had permitted, allowed NIPSCO to improperly increase its tax expense. Additionally, the Industrial Intervenors claim that NIPSCO's normalization by Comprehensive Interperiod Income Tax Allocation[4] and the income tax attributable to the Allowance for Funds Used During Construction[5] contribute to the overstatement of the income tax expense.

We disagree with the Industrial Intervenors. It is obvious from the Commission's Finding 10 that the Commission was aware of NIPSCO's accounting methods and the adjustments being made.

In Finding 10 the Commission discussed NIPSCO's pro forma income tax expense and the "tax normalization" theory which included normalizing the interest component of the Allowance for Funds Used During Construction. The Commission also discussed the consequences of NIPSCO's adjustments by Comprehensive Interperiod Income Tax Allocation.

We agree with NIPSCO that the Commission's decision was reasonable and supported by substantial evidence and that the Industrial Intervenors are not entitled to have the tax issues relitigated in this court nor the evidence thereon reweighed by us.

A great deal of evidence was presented by both NIPSCO, primarily through Mr. Kujawa, and the Industrial Intervenors'

witnesses on the accounting aspects of the income tax considerations. The Commission chose to consider that evidence which, within its expertise, it believed most accurately represented the accounting and tax policy of NIPSCO and Public Utilities in general.

The Commission's detailed findings indicate to us that the Commission has carefully considered the income tax accounting methods and has made a knowledgeable and conscientious conclusion. We presume this conclusion is valid. *Boone County Rural Electric Membership Corp. v. Public Service Commission* (1959), 239 Ind. 525, 159 N.E.2d 121; *Public Service Commission v. City of Indianapolis, supra.*

The Industrial Intervenors are in effect asking us to recompute and recalculate, a task which we are pleased to leave to the expertise of the Commission. Absent a showing of abuse of discretion we will not reverse. *Capital Improvement Board of Managers v. Public Service Commission, supra; Daviess-Martin County Rural Telephone Corporation v. Public Service Commission* (1961), 132 Ind.App. 610, 174 N.E.2d 63.

## IV.

### COST OF SERVICE ADJUSTMENTS

*ISSUE* — Whether the Commission allowed for the correct cost of service adjustments.

*PARTIES' CONTENTIONS*—The Industrial Intervenors contend that the Commission's adjustments to NIPSCO's cost of service are not supported by sufficient evidence and are based on incomplete findings.

NIPSCO responds there is no error in the cost of service adjustments and that the evidence is sufficient and the findings adequate.

---

4. Comprehensive Interperiod Income Tax Allocation is a method of normalization to account for inconsistencies when costs and revenues are recognized at different time periods for income tax purposes and for book purposes.

5. The Allowance for Funds Used During Construction is a method of normalization to account for the costs and interest charges which result from long term construction projects.

*CONCLUSION*—The adjustments made to cost of service were reasonable and based on sufficient evidence.

■ Numerous adjustments to the cost of service computations were proposed by both NIPSCO and the Industrial Intervenors in order to aid the Commission in determining NIPSCO's pro forma net operating income for the twelve months ending December 31, 1974. The Commission carefully sifted through these proposed adjustments allowing some and disallowing others in order to reach a figure which represented the jurisdictional pro forma net operating income, a task well within their expertise. *Capital Improvement Board of Managers v. Public Service Commission, supra.*

Twenty-one separate findings within Finding 8 were made by the Commission as to the cost of service adjustments which were allowed and the amount allowable. These adjustments were supported by sufficient evidence in the record. *L. S. Ayres & Co. v. Indianapolis Power & Light Co., supra; City of Evansville v. Southern Indiana Gas & Electric Co., supra.* The Industrial Intervenors are not content with the cost of service adjustments; they show no error but are merely asking us to readjust in a fashion more favorable to their position.

The Industrial Intervenors also object to the Commission's order concerning the demand diversity credit. The demand diversity credit provides a monetary incentive for NIPSCO's large volume industrial users to curtail their use of electricity during periods when demand for electricity is at its peak. The Industrial Intervenors requested that the figure used for the demand diversity credit be based on alternative computation. NIPSCO opposed this adjustment both at the hearing and on appeal.

In Finding 8D the Commission rejected this adjustment. It reasoned that because the basis for computing revenue was an adjusted year, and in the absence of a method to forecast when or if a new peak will occur or what decision will be made by the large volume user, the demand diversity credit should be based on the actual amount for 1974, and not the adjustment proposed

by the Industrial Intervenors. This finding is complete and based on sufficient evidence. Such a decision is reasonable and well within the discretion of the agency. We will not disturb it. *L. S. Ayres & Co. v. Indianapolis Power & Light Co., supra; City of Evansville v. Southern Indiana Gas & Electric Co., supra.*

V.

RATE DESIGN

*ISSUE* — Whether the Commission acted properly in adopting the rate design proposed by NIPSCO.

*PARTIES' CONTENTIONS*—The Industrial Intervenors claim that the rate design approved by the Commission is inadequate, discriminatory and unlawful in that it does not provide for the increase to be spread evenly among the various classes of customers.

NIPSCO replies the rate design is just and reasonable and is based upon substantial evidence.

*CONCLUSION*—The rate structure approved by the Commission is fair and reasonable; it is based on sufficient evidence and the Industrial Intervenors have shown no error requiring it be set aside.

■ The Commission's task in this case as in any other utility rate proceeding is twofold: (1) it must determine the Utility's overall revenue requirements, and (2) it must then provide that the required revenue be collected through just and reasonable rates. *L. S. Ayres & Co. v. Indianapolis Power & Light Co., supra; City of Evansville v. Southern Indiana Gas & Electric Co., supra.*

The latter task is accomplished through the function of rate design. In the instant case NIPSCO proposed and the Commission accepted and approved a rate design whereby different classes of customers receive different percentages of increases in their rates to produce the required increase in revenues.

The order of the Commission as to the rate design is included in Finding 11, which provided the following percentage of increase:

| CLASS OF CUSTOMER | PERCENTAGE OF INCREASE |
|---|---|
| Residential | 15.83 |
| Commercial | 14.16 |
| Power | 34.34 |
| Rate 702 | 42.24 |
| Rate 703 | 45.31 |
| Street Lighting | 12.00 |
| Municipal Service | 9.78 |
| Railroads | 18.12[6] |

In reviewing the rate structure proposed by NIPSCO and adopted by the Commission we are guided by *Ind.Code* 8–1–2–4 which establishes:

> The charge made by any public utility for any service rendered or to be rendered either directly or in connection therewith shall be *reasonable and just* . . . . (emphasis added).

This is our standard of review and absent a showing of unreasonableness the Commission's order must be upheld. *Public Service Commission v. City of Indianapolis, supra.*

The Industrial Intervenors vigorously and extensively argue against the rate design primarily contending that it is based on insufficient evidence, and that it is discriminatory in that the rate increase was not spread evenly among various classes of customers. According to the Industrial Intervenors, the majority of NIPSCO's rate design evidence as presented by witnesses Johnson and Herz is in the nature of hearsay in that the witnesses did not in fact compute all the statistics, and as such the Industrial Intervenors were unable to effectively cross-examine the evidence submitted.

This argument is fallacious. Assuming, without deciding, that this evidence is hearsay, it is well established in Indiana that admission of hearsay evidence in an administrative hearing is not reversible error provided that there is other legally competent evidence which has been admitted. *C. T. S. Corp. v. Schoulton* (1978), Ind., 383 N.E.2d 293; *Capital Improvement Board of Managers v. Public Service Commission, supra.* An examination of the testimony and exhibits which NIPSCO presented on its rate design reveals that sufficient legally competent evidence, other than the purported hearsay evidence, was admitted at the hearings.

The Industrial Intervenors do not supply us with any rate design fact or statistic which is incorrectly calculated or misrepresented. The Industrial Intervenors had access to the books and records of NIPSCO and had the opportunity to research the facts to rebut NIPSCO's calculations.

Finally, we deem the Industrial Intervenors' objections to go to the weight and probative value of the evidence rather than to the admissibility. The Commission has the expertise and responsibility to evaluate this evidence. *Johnson County Rural Electric Membership Corporation v. Public Service Commission* (1978), Ind.App., 378 N.E.2d 1.

■ The Industrial Intervenors' second primary attack on the rate design concerns the absence of an evaluation of the cost of service by the Commission.[7] Cost of service, according to the Industrial Intervenors, is the proper foundation upon which the rate design should be based.

The Industrial Intervenors have cited no cases which specifically hold that the rate design must be based on cost of service; we find no cases so stating and must conclude that the statute, *Ind.Code* 8–1–2–4, does not state or imply that there must be a finding of cost of service in order to determine the rate design.

Although cost of service may be a factor the Commission could usefully consider in determining the rate design, it is not error for the Commission not to determine the

---

**6.** The Board, however, in Finding 12, ordered that these rates be decreased "across the board" so as to produce annual additional electric revenues in the amount of $50,152,051.

**7.** Although the Commission did not make a cost of service determination in its Findings, NIPSCO did present as evidence in the hearings a cost of service study.

cost of service in its findings. *See e. g., Boone County Rural Electric Membership Corp. v. Public Service Commission, supra; Public Service Commission v. City of Indianapolis, supra; Public Service Commission v. Indiana Bell Telephone Co., supra; Capital Improvement Board of Managers v. Public Service Commission, supra; L. S. Ayres & Co. v. Indianapolis Power & Light Co., supra.*

The Commission's finding on rate design is sufficient and based on substantive evidence. We find the rate design as established to be lawful and equitable.

## VI.

### PROCEDURAL MATTERS

■ A.  Adoption of Test Year.

*ISSUE* — Whether the proper procedure was followed in the adoption of the test year and the adjusted year method.

*PARTIES' CONTENTIONS*—The Industrial Intervenors contend that the test year chosen was objectionable primarily because it included two separate rate schedules. NIPSCO responds that the test year chosen was adequate and that the Industrial Intervenors were merely asking for a later test year to delay the proceedings.

*CONCLUSION*—The test year chosen was proper and achieved its purpose.

NIPSCO filed its Petition for Rate Increase November 26, 1974, based on a test year ended June 30, 1974. At the pre-hearing conference the Industrial Intervenors argued for a test year ending March 31, 1975. The Commission adopted a test year ending December 31, 1974 in its prehearing order issued on January 3, 1975. This test year included two separate rate schedules; NIPSCO had previously received a rate increase which went into effect on March 22, 1974. Although the Industrial Intervenors object to a test year that includes two rate schedules, they show no error in a determi-

nation which must be left to the discretion of the agency. *Capital Improvement Board of Managers v. Public Service Commission, supra.*

Finding 8 stated that the Commission established the twelve months ending on December 31, 1974, to be the test year. The Commission does not state its reasoning for choosing to end the test year on that particular date, however we can reasonably infer that the Commission, in its expertise, concluded that postponing the test year to March 31, 1975 would be detrimental to the rate making process.[8]

The selection of a proper test year is one of the many decisions which must be left to the discretion of the Commission. *Ind.Code* 8–1–2–47. Our review is limited to whether, on the facts of this case, the test year selected was reasonable and there was no clear error of judgment. *Public Service Commission v. City of Indianapolis, supra; L. S. Ayres & Co. v. Indianapolis Power & Light Co., supra.* The Industrial Intervenors have not demonstrated that the Commission erred or acted unreasonably in its selection of a test year.

### B.  Notice.

*ISSUE* — Whether the proper procedure was followed by NIPSCO in the notice given of its proposal for a rate increase.

*PARTIES' CONTENTIONS*—The Industrial Intervenors claim that the Commission lacked jurisdiction in that the notice to the public was defective.

NIPSCO responds that its notice was more than adequate and properly complied with statutory requirements.

*CONCLUSION*—The legal notice given by NIPSCO complied with the statute and the Industrial Intervenors have shown no error.

■ The statute which governs the notice requirements for rate making hearings, *Ind.Code* 8–1–2–61, provides in part:

---

**8.** Any error in failing to make a specific finding as to why the December 31, 1974 test year was chosen is harmless. *See Hawley v. South* Bend, Department of Redevelopment (1978), Ind., 383 N.E.2d 333.

Whenever any public utility shall file a complaint or petition as to any matter concerning an increase of its own rates, affecting its patrons in any county in which such public utility renders service, the public utility shall publish a notice of the filing of such petition or complaint in a newspaper of general circulation published in such county.

The position of the Industrial Intervenors is that NIPSCO's notice was invalid because after it was given NIPSCO pre-filed new rates making the rates litigated different from those filed at the time of the notice.

Our statute, however, merely requires reasonable notice to be given of a rate increase and there is no necessity for the amount of the increase to be clearly specified in the notice. *State ex rel. Public Service Commission v. Boone Circuit Court* (1957), 236 Ind. 202, 139 N.E.2d 552 (opinion on rehearing). As this court recognized in *City of Evansville v. Southern Indiana Gas & Electric Co., supra,* rate making hearings by necessity must remain flexible. The petitioner must be able to amend and refile evidence within the Commission's discretion in order for the hearing to be effective.

It is true that lack of proper notice is jurisdictional and without it the Commission would not have been able to hear the case. *L. S. Ayres & Co. v. Indianapolis Power & Light Co., supra.* But in this instance the statutory notice requirements were fulfilled and the Commission had jurisdiction.

C. Error in the Computation of NIPSCO's Rate Schedules Filed Pursuant to the Commission's October 6, 1975 Order, and Denial of Additional Hearings on This Matter.

*ISSUE* — Whether the Industrial Intervenors were entitled to an additional hearing on the rate schedule and adjustments filed by NIPSCO pursuant to the Commission's October 6, 1975 order.

*PARTIES' CONTENTIONS*—The Industrial Intervenors claim that the rates as

finally established were miscalculated and the Commission erred in not holding a hearing upon the final determination of the rates.

NIPSCO responds that there was no error in that it followed requirements of the Commission's order and the Commission adhered to its statutory authority.

*CONCLUSION*—The rates as finally established were properly calculated and no subsequent hearing was necessary.

In Finding 12 the Commission determined that NIPSCO was entitled to a rate increase. The Commission found, however, that the rate structure as proposed by NIPSCO would produce revenue to NIPSCO in excess of the amount approved by the Commission. As such, the Commission held that NIPSCO's rate structure should be decreased "across the board" to produce the amount ordered by the Commission.

The Industrial Intervenors objected to this reduction procedure. First, they claim NIPSCO did not properly decrease the rates "across the board" and second, they objected because the Commission would not grant a subsequent hearing to approve these rates as adjusted.

As to the "across the board" decrease in the rates, NIPSCO acted pursuant to the Commission's order. The rates were decreased as follows:

| Customer Classification | Petitioned Increase Percent | Ordered Increase Percent |
|---|---|---|
| Gen. Residential | 14.88 | 10.21% |
| Total Residential | 15.83 | 11.14 |
| Total Commercial | 14.16 | 9.59 |
| Municipal Power | 9.28 | 5.01 |
| Total Municipal | 9.78 | 5.49 |
| Rate 702 | 42.24 | 36.51 |
| Rate 703 | 45.31 | 39.36 |
| Total Power | 34.34 | 28.90 |

NIPSCO calculated the rate decrease by reducing each step of each rate approximately 4 percent in order to arrive at the total authorized revenue. The relationships among the various rate classification and the approved rate design are those maintained.

The Industrial Intervenors claim that the rates should have been adjusted by re-dis-

tributing the increase only. Inherent in the Industrial Intervenors' suggestion is the re-alignment of the various customer classifications, thereby modifying the rate design. This interpretation goes against the clear intent and mandate of the Commission. *Capital Improvement Board of Managers v. Public Service Commission, supra.* The Industrial Intervenors are merely asking for a decrease to be computed differently and in a fashion more favorable to it.

It is clear from the record that NIPSCO followed the order of the Commission.

 Further, we find that there was no need for a hearing on the final rates as set and computed. The rate issue had been exhaustively litigated and fully considered by the Commission. The Commission had made its findings and order. The only change required was an arithmetical computation which NIPSCO did in accordance with the Commission's order. No need has been demonstrated for an additional hearing. *Capital Improvement Board of Managers v. Public Service Commission, supra.*

In all respects the decision of the Commission is affirmed.

LOWDERMILK, J. (sitting by designation), and SHIELDS, J., concur.