**OFFICE OF the UTILITY CONSUMER COUNSELOR (Formerly, Office of Public Counselor), Appellant,**

v.

**PUBLIC SERVICE COMPANY OF INDIANA, INC., Appellee.**

No. 2–681A211.

Court of Appeals of Indiana, Fourth District.

March 1, 1983.

Jan E. Helbert, Deputy Consumer Counselor, Indianapolis, for appellant.

Jon D. Noland, Greg K. Kimberlin, Duejean C. Garrett, Plainfield, for appellee.

## MEMORANDUM DECISION

MILLER, Judge.

This appeal comes to us from an order entered by the Public Service Commission of Indiana (Commission) granting an electrical service rate increase to Public Service Company of Indiana (PSI). The Office of the Utility Consumer Counselor (Consumer Counselor), on behalf of the affected ratepayers, questions two decisions made by the Commission in the course of raising PSI's rates:

1. Did the Commission err in disallowing accounting adjustments which would have reduced the tax expense for which the ratepayers would be responsible?

2. Did the Commission err in rejecting the Consumer Counselor's proposed cost-of-capital formula in determining a fair rate of return for PSI?

After reviewing these two issues and the pertinent law, we find no error and affirm the order of the Commission.

## FACTS

On December 8, 1980, PSI filed a petition for authority to increase its rates and charges for electric service and for approval of new schedules of rates and charges and of rules and regulations therefor. PSI alleged the then existing rates and charges were unjust, unreasonable, and confiscatory. The Commission granted the various intervening petitions of Indiana Retail Council, Indiana School Boards Association, Department of Defense and Federal Executive Agencies, General Motors Corp., Weston Paper and Manufacturing Co., Indiana Farm Bureau, Inc., and Industrial Users Group. PSI's proposed new schedules of electric service rates were designed to increase its permanent annual operating revenues by $119,614,000. The Commission's order, entered after public hearings in Terre Haute and Kokomo, authorized a rate increase to produce additional annual operating revenue of $112,718,000.

During the course of the hearings, two witnesses—the first, a certified public accountant appearing for the Consumer Counselor; the second, a staff accountant for the Commission—sponsored respective accounting adjustments to PSI's revenue requirement for paying its federal income taxes. Both witnesses contended that a reduction in revenue of approximately $12,000,000 would accurately reflect the use of PSI's interest expense in reducing taxes. The theory propounded was that, when actually calculating taxes, PSI utilizes all allowable

interest deductions to reduce its tax liability; however, when expensing taxes for ratemaking purposes, the ratepayers are assessed for taxes which are not reduced by that interest attributable to financing construction work in progress. The Commission's staff report acknowledged, and the Commission itself agreed in its order that, because it was the investors' sole responsibility to bear the cost of work in progress (such cost not being included in rate base), the annualization of interest expense to allow ratepayers the tax benefit associated with the cost of financing such work would be a "mismatch." The Commission thus disallowed this adjustment.[1]

The only other issue appealed concerns the fair rate of return of 12.19% on PSI's net original cost rate base as determined by the Commission. PSI's witness Langum proposed a 12.25% return on original cost rate base premised on the cost of capital generated by the following projected capital structure:

| | "Capital Structure | Cost | Return |
|---|---|---|---|
| Debt | 48.20% | 9.58% | 4.62% |
| Preferred stock | 12.87 | 8.38 | 1.08 |
| Common equity | 38.93 | 16.75 | 6.52 |
| Rounding | -- | -- | .03 |
| | 100.00% | | 12.25%" |

Record, p. 1966. The Consumer Counselor's witness, public utility consultant Turner, on the other hand, proposed an actual capital structure with the rate of return ranging from 10.28% to 10.45%. (Record, p. 3055.)

The Commission considered the following modified version of Consumer Counselor's formula in its order:

| | "Capital Structure | Cost | Return |
|---|---|---|---|
| Long-term debt | 43.35% | 9.04% | 3.92% |
| Short-term debt | .97 | 11.33 | .11 |
| Preferred stock | 11.70 | 7.92 | .93 |
| Investment tax credit pre-1971 | .19 | -- | -- |
| Deferred income taxes | 9.06 | -- | -- |
| Customer deposits | .06 | 6.0 | -- |
| Reserves | .36 | -- | -- |
| Common stock equity | 34.31 | 15.75 | 5.40 |
| | 100.00% | | 10.36%" |

Record, p. 3606. The Commission would not accept the Consumer Counselor's proposed capital structure because of its inclusion of consumer-contributed deferred income taxes, customer deposits, investment tax credits, and operating reserves. Instead, the Commission granted PSI a fair rate of return which did not rely solely on simplistic distinctions between two cost-of-capital formulae but considered various other factors as well, such as the ability to attract new capital in today's money markets, production efficiency, and the returns of other industries. The Consumer Counselor appeals from the Commission's order, citing error in its failure to adjust PSI's tax expense to reflect reductions for interest used on construction and in its failure to accept a cost-of-capital formula which would raise the rate base but lower the rate of return.

---

1. The Commission's order contained the following:

"(o) *Interest Annualization.* Both [Consumer Counselor] and Staff proposed an adjustment to reduce [PSI's] federal income taxes applicable to retail customers on the basis of annualization of interest expense on outstanding debt, although their methods were dissimilar. The Staff acknowledged that in the past, annualization of interest expense has not been an acceptable adjustment, but felt the magnitude of the annualized interest justified the adjustment. The Staff, unlike [Consumer Counselor], recognized that 'in theory the annualization of interest expense is a mismatch. The interest is associated with construction and not plant in service.' (Staff Report 4) Staff consequently sought to compute additional deferred income taxes applicable to the debt component of annualized AFUDC [ (Allowance for Funds Used During Construction) ]. However, the Staff's computation of construction work in progress at February 28, 1981, immediately after large financings by [PSI], fails to recognize the large construction prefinancing which existed at that time. We have found many times that the annualization of interest expense is improper because of its association with construction work in progress rather than rate base, and Staff's calculations made at a time when [PSI] was in a prefinancing position does not dissuade us of that position. The [Consumer Counselor's] and the Staff's adjustments will be disallowed."
Record, pp. 3624–25.

DECISION

*Interest Annualization*—Failure to Allow Ratepayers Tax Benefits Received by Investors Resulting from Interest Payments on Cost of Construction Work in Progress

The Consumer Counselor argues the Commission improperly denied adjustments broached by the Counselor and the Commission's own staff. Both these adjustments proposed the computation of federal income taxes be reduced by interest expenses associated with financing PSI's construction work in progress.

The ratepayers of a utility are responsible for its operating expenses including, among other things, wages, fuel costs, taxes, etc. The consumer must also pay a reasonable rate of return on that capital which is the source of used and useful plant *in service.* The investor, on the other hand, provides all the capital, such capital being invested in both active plant and construction in progress. *Capital Improvement Board of Managers v. Public Service Commission,* (1978) 176 Ind.App. 240, 375 N.E.2d 616. Associated with the construction work in progress are financing charges which are deducted from the utility's federal income taxes as interest expenses. However, when PSI drafted its proposed rate structure, it did not deduct this amount of interest from the federal income tax amount allocated against the ratepayers.

██ The Consumer Counselor argues the ratepayers should benefit from this deduction by being assessed only for that amount of revenue required to pay the actual tax liability, which advice, if heeded, would reduce needed revenue calculations by over twelve million dollars. This contention undeniably has merit. Unfortunately, this question was decided adversely to the Consumer Counselor in *Capital Improvement Board of Managers, supra,* where this court ruled that benefits accruing from construction work in progress, such as tax reductions, should be passed on to the investor who has borne the cost of the work and not to the consumer who pays neither the cost of nor a rate of return on the construction.

(Such work in progress cannot be included in a utility's rate base.) Thus, as the Commission staff here acknowledged, "[i]n theory the [proposed] annualization of interest expense is a mismatch. The interest is associated with construction and not plant in service." Record, p. 3385. The amount in interest here is not in dispute, and, in applying the law to facts, we cannot say the Commission erred in not annualizing the deduction associated with interest used for financing current construction.

*Fair Rate of Return*

The other issue in question concerns the Commission's rejection of a proposed capital structure embedded in a cost-of-capital formula propounded by the Consumer Counselor which would place consumer-contributed deferred tax reserves in the rate base. The chief concern is whether the rate of return granted to PSI was accurately formulated.

██ It is not necessary to delve into technical terms and accounting formulae associated with rate increase petitions in order to decide this question in this particular proceeding. The Consumer Counselor argues its capital structure approach, with its higher rate base and lower rate of return, is most appropriate for determining the cost of capital and, therefore, a more accurate rate of return. The Commission rejected the Consumer Counselor's proposal, which calculations would have garnered PSI only a 10.36% rate of return. Nor, however, does it appear the Commission strictly followed PSI's proposed capital structure. PSI's proposed rate was 12.25% while the Commission adopted a rate of 12.19%. It *is* apparent that the Commission did not rely exclusively on either party's cost of capital formula. It very clearly stated that it considered other evidence in conjunction with cost of capital in reaching its conclusions, and, as the Commission stated in its order, the cost of capital is not the sole measure to be used in determining a fair rate of return. In this regard, the United States Supreme Court has stated:

"What annual rate will constitute just compensation depends upon many circum-

stances, and must be determined by the exercise of a fair and enlightened judgment, having regard to all relevant facts. A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties . . . . The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties."

*Bluefield Water Works & Improvement Co. v. Public Service Commission of West Virginia,* (1923) 262 U.S. 679, 692–93, 43 S.Ct. 675, 679, 67 L.Ed. 1176. Thus, the Commission was well within its powers to review and consider in its order the following evidence in establishing a fair rate of return:

"[PSI's] operating results, *pro forma* under present rates, show a serious deficiency when measured by recognized financial standards such as earnings to market ratio, market to book ratio, return on book equity, coverage of fixed charges and the high percentage of earnings represented by noncash allowance for funds used during construction (AFUDC). The market price of [PSI's] common stock is substantially below its book value, and its earnings coverages of interest on long-term debt and preferred dividends are at levels likely to jeopardize its credit ratings. The evidence in this cause clearly shows that [PSI], like other public utilities, is facing not only increasing operating expenses as a result of continued inflation, but is also experiencing substantially higher capital costs. The rate of earnings of other companies, with which [PSI] must compete in the capital markets, and the continued high inflation and interest rates must be recognized in establishing rates and allowed operating income for [PSI]. For instance, the evidence indicated that in the last five years the broadcasting industry has experienced a return on common equity of 23%, the tobacco industry a 20.5% return on common equity, the electric equipment industry a 20% return on common equity, the publishing industry a 19.3% return on common equity, and many other industries have experienced comparable returns on common equity. (Petitioner's Exhibit K–1, p. 32.) From evidence of record in this proceeding, including evidence as to current money market conditions requiring higher equity returns than at the time of [PSI's] last rate case, we find that [PSI's] return on equity capital should be not less than 16.75%.

"A disturbing element in this case associated directly with the rate of return is [PSI's] coverage of fixed charges for the twelve months ended September 30, 1980, and projected for the twelve months ended September 30, 1981. (Petitioner's Exhibit K–1, p. 74) The evidence shows that for the twelve months ended September 30, 1981, the times interest earned before taxes is 2.62 and the times interest earned after taxes is 2.11, including AFUDC. We are concerned that these low coverages of fixed charges for [PSI] could result in the downgrading of its securities, which would increase costs of new outside capital to [PSI] and in turn would be reflected in higher rates to [PSI's] customers.

"While the cost of capital, including equity capital, to [PSI] is an important element properly to be considered in the determination in a fair rate of return on the fair value of [PSI's] rate base, we recognize, as we have many times previously in other cases, that *cost of capital is not necessarily synonymous with, equivalent to, or the sole measure of a fair rate of return. From all the evidence of record in this proceeding,* including the availability of cost free funds to [PSI] from deferred income taxes and tax credits (but excluding job development investment credit), the fact that [PSI] has

not included any cash working capital in its rate base calculation, and [PSI's] demonstrated power production efficiencies, *we find that [PSI] should be permitted to earn not less than 12.19% on its net original cost rate* base, which would require a fair rate of return for [PSI] on its fair value rate base as determined in Finding No. 6 of not less than 7.9%."

Record, pp. 3609–12. (Emphasis added.) We cannot say, from reviewing the Commission's order, that our adoption of the Consumer Counselor's cost of capital computation would necessitate a different rate of return. The Commission, in this case, considered various factors in calculating a rate increase for PSI including the ability to attract new capital, a comparison with return in other industries, production efficiency, and credit ratings. Consumer Counselor has failed in its burden to impeach the order's presumptive validity. *See Bethlehem Steel Corp. v. Northern Indiana Public Service Co.,* (1979) Ind.App., 397 N.E.2d 623. The Commission's order contains specific findings on the issue of fair rate of return which are supported by substantial evidence in the record.[2] *See Indiana Bell Telephone Co., Inc. v. T.A.S.I., Inc.,* (1982) Ind.App., 433 N.E.2d 1195; *Citizens Energy Coalition,*

2. The Consumer Counselor contends the Commission ignored crucial evidence when it failed to acknowledge testimony from Consumer Counselor witness Turner, public utility consultant. The evidence arises again in the context of the cost-of-capital formula. The Commission wrote:

"We also reject Mr. Turner's proposal to include customer deposits and operating reserves totalling $10,125,410 in [PSI's] capital structure for purposes of computing cost of capital. We find these items to be sources of working capital to [PSI]. Since [PSI] has not been allowed a working capital allowance, it would be improper to include customer deposits and operating reserves in [PSI's] capital structure for the purpose of computing cost of capital. To the extent that cost of capital is a critical consideration in finding the proper fair rate of return, it follows that the more objective and precise we are in determining the cost of capital the more accurate and supportable our fair rate of return finding will be. It appears that if we were to include an appropriate working capital allowance in [PSI's] fair value rate base, then we might more accurately determine its true cost of capital by including such items as customer deposits, operating reserves, investment tax credits, deferred income taxes, etc., in the capital structure. *However, we cannot do so in this case because no party, not even the [Consumer] Counselor who would have us include such items in [PSI's] capital structure, has offered any evidence whatsoever which would support a finding by the Commission of the appropriate amount to be allowed [PSI] for working capital allowance inclusion in its rate base. We might have been able to accept [Consumer Counselor's] proposed capital structure had [Consumer Counselor] also submitted testimony on what an appropriate working capital allowance would be."*

Record, pp. 3608–09. (Emphasis added.) The Consumer Counselor claims there is refutation for the italicized portion of the order reproduced above. Witness Turner supposedly testified to an appropriate working capital of 18 million dollars, a number which was *not computed or explained by witness Turner,* but was actually supplied in an off-the-cuff manner by the Counselor.

The pertinent testimony relied upon by Consumer Counselor, as relied on in his brief, was:

"[Consumer Counselor] Can you tell us approximately what a working capital, working capital requirement might be?

[Turner] There's a formula used, which is the 45 day rule of thumb being phased out, to be replaced by other methodologies.

Q. Assuming a 45 day operating and maintenance expense, that would be about how much in this case?

A. I would have to calculate that.

Q. Do you have an approximate figure?

A. No. I would have to calculate it.

Q. Would you do that, please, quickly, if you can?—Subject to check, would you say it would be approximately 18 million dollars?

A. Gross working capital requirement?

Q. Yes.

A. Yes, I would."

Record, p. 3120. The expert Turner testified he could not approximate a working capital requirement without calculating it—which he did not do. His acceptance of the questioner's ballpark figure was conditional—"subject to check." We do not find this to be credible evidence, but even if it had some slight credibility, we must refer the Consumer Counselor to the body of our opinion where we found the Commission based its order on several factors. The Consumer Counselor has not shown us how this $18,000,000 discrepancy in a capital structure of approximately 2.5 billion dollars has critically affected the rate of return, particularly when it has not even demonstrated the capital structure was the pivotal consideration in the Commission's decision.

*Inc., v. Indiana & Michigan Electric Co.,* (1979) Ind.App., 396 N.E.2d 441. Our standard of reviewing orders of the Commission goes no higher because it is not within our province nor our expertise to supplant the Commission's judgment with our own. *Capital Improvement Board of Managers, supra.* The rate increase is not contrary to law, and, thus, we cannot agree with the Consumer Counselor that the Commission erred.

Affirmed.

YOUNG, P.J., and CONOVER, J., concur.